## 2013-5078

# United States Court of Appeals
# for the Federal Circuit

STOCKTON EAST WATER DISTRICT,
SAN JOAQUIN COUNTY, STOCKTON CITY,
and CALIFORNIA WATER SERVICE COMPANY,

*Plaintiffs,*

*and*

CENTRAL SAN JOAQUIN WATER CONSERVATION DISTRICT,

*Plaintiff-Appellant,*

*v.*

UNITED STATES,

*Defendant-Appellee.*

*Appeal from the United States Court of Federal Claims in
No. 04-CV-0541, Judge Christine O.C. Miller.*

## BRIEF FOR PLAINTIFF-APPELLANT

Roger J. Marzulla
Nancie G. Marzulla
Marzulla Law, LLC
1150 Connecticut Avenue, NW
Suite 1050
Washington, DC 20036
(202) 822-6760 (telephone)
(202) 822-6774 (facsimile)
Roger@marzulla.com
Nancie@marzulla.com

*Counsel for Appellant
Central San Joaquin
Water Conservation District*

July 10, 2013

# Certificate of Interest

Counsel for Plaintiff-Appellant certifies the following:

1.      The name of every party or amicus curiae represented by me is:

      Central San Joaquin Water Conservation District.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

      Not Applicable.

3.      All parent corporations and any publically held companies that own 10% or more of the stock of the party or amicus represented by me are:

      None.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus curiae represented by me in the trial court or agency or are expected to appear in this Court are:

      Nancie G. Marzulla; Roger J. Marzulla; Marzulla Law, LLC.

# Table of Contents

Certificate of Interest ........................................................i

Table of Authorities ........................................................iv

Statement of Related Cases................................................ vii

Jurisdictional Statement ................................................. viii

Opening Brief of Plaintiff-Appellant—
Central San Joaquin Water Conservation District ....................................1

Statement of the Issues..................................................4

Statement of the Case....................................................4

    1.   Nature of the case..................................................4

    2.   Procedural history .................................................6

Statement of the Facts ..................................................9

Summary of the Argument................................................15

Standard of Review......................................................19

Argument................................................................21

I.    The trial court's misinterpretation of Article 3(c) of the contract
caused it to erroneously conclude that Central was entitled to no
expectancy damages for Reclamation's breach ..........................21

    A.    The trial court erroneously misinterpreted Article 3(c), which
required Reclamation to provide a minimum of 56,000 acre-feet
of water per year to Central, to instead require only that
Reclamation provide "up to" that quantity if requested by
Central ......................................................23

    B.    The trial court's misinterpretation of Article 3(c) led it to
erroneously ignore that the breach was Reclamation's failure to
deliver the full contract minimum of 56,000 acre-feet ...............26

C.    The trial court misinterpreted this Court's standard for proving expectancy damages by requiring that Central prove how much water its farmers would have requested—which was not a contract requirement .......................................................................30

II.    Central presented ample evidence of farmer demand for 56,000 acre-feet per year and the trial court's contrary finding is erroneous ...................32

A.    Central needed the full 56,000 acre-feet per year to alleviate groundwater depletion .........................................................................35

B.    Because Central was contractually required to pay for 56,000 acre-feet of water each year, Central would have taken that amount at minimum..........................................................................37

C.    All Government and engineering studies forecast that Central would use at least a net amount of 50,000 acre-feet each year ...........40

D.    Central would have sold any excess water..........................................48

III.    The trial court anticipated this appeal and therefore made factual findings that permit this Court to determine Central's damages...................50

Conclusion ...........................................................................................................53

# Table of Authorities

## Cases

*Bluebonnet Savings Bank, FSB v. United States*,
266 F.3d 1348 (Fed. Cir. 2001) .......................................................21

*California Fed. Bank, FSB v. United States*,
245 F.3d 1342 (Fed. Cir. 2001) .......................................................27

*California v. United States*,
438 U.S. 645 (1978)............................................................... 10, 42

*Coast Fed. Bank, FSB v. United States*,
48 Fed. Cl. 402 (2000) ...................................................................27

*Dulien Steel Products, Inc. v. United State*s,
143 Ct. Cl. 484 (1958) ...................................................... 17, 20, 26

*Estate of Berg v. United States*,
231 Ct. Cl. 466 (1982) ...................................................................26

*Everett Plywood Corp. v. United States*,
206 Ct. Cl. 244 (1975) ...................................................... 17, 20, 26

*Fawick Corp. v. United States*,
149 Ct. Cl. 623 (1960) ...................................................................20

*George Hyman Constr. Co. v. United States*,
832 F.2d 574 (Fed. Cir. 1987) .......................................................19

*Glendale Fed. Bank, FSB v. United States*,
239 F.3d 1374 (Fed. Cir. 2001) .....................................................20

*Indiana Michigan Power Co. v. United States*,
422 F.3d 1369 (Fed. Cir. 2005) ................................................ 19, 21

*Missile Facilities, Inc. v. United States*,
189 Ct. Cl. 237 (1969) ............................................................. 21, 27

*San Carlos Irrigation & Drainage Dist. v. United States*,
111 F.3d 1557 (Fed. Cir. 1997) .....................................................20

*San Carlos Irrigation & Drainage Dist. v. United States,*
    877 F.2d 957 (Fed. Cir. 1989) ...............................................................19

*Standard Havens Prod., Inc., v. Gencor Indus., Inc.,*
    953 F.2d 1360 (Fed. Cir. 1991) .............................................................19

*Stockton East Water Dist. v. United States,*
    109 Fed. Cl. 460 (2013) ................................................................ *passim*

*Stockton East Water Dist. v. United States,*
    109 Fed. Cl. 760 (2013) .........................................................................5

*Stockton East Water Dist. v. United States,*
    101 Fed. Cl. 352 (2011) .........................................................................5

*Stockton East Water Dist. v. United States,*
    76 Fed. Cl. 497 (2007) ...........................................................................5

*Stockton East Water Dist. v. United States,*
    76 Fed. Cl. 470 (2007) ......................................................................5, 7

*Stockton East Water Dist. v. United States,*
    75 Fed. Cl. 321 (2007) ......................................................5, 7, 23, 36

*Stockton East Water Dist. v. United States,*
    72 Fed. Cl. 141 (2006) ...........................................................................5

*Stockton East Water Dist. v. United States,*
    70 Fed. Cl. 515 (2006) ...........................................................................5

*Stockton East Water Dist. v. United States,*
    62 Fed. Cl. 379 (2004) ......................................................................5, 6

*Stockton East Water District v. United States,*
    638 F.3d 781 (Fed. Cir. 2011) ..................................................... *passim*

*Stockton East Water District v. United States,*
    583 F.3d 1344 (Fed. Cir. 2009) ................................................... *passim*

*Story Parchment Co. v. Paterson Parchment Paper Co.,*
    282 U.S. 555 (1931)..............................................................................21

*United Indus. Syndicate, Inc. v. Western Auto Supply Co.*,
   686 F.2d 1312 (8th Cir. 1982) ..............................................................20

*Yankee Atomic Elec. Co. v. United States*,
   536 F.3d 1268 (Fed. Cir. 2008) ................................................... 19, 20


**Statutes**

28 U.S.C. § 1295(a)(3) .........................................................................v

28 U.S.C. § 1491(a) .............................................................................v

28 U.S.C. § 5000 .................................................................................5

Cal. Water Code § 74521 .....................................................................10


**Other Authorities**

McCormick, Damages § 175 (1935) ............................................... 17, 26

Uniform Commercial Code § 2-713 ................................................ 17, 26

**Statement of Related Cases**

In accordance with Federal Circuit Rule 47.5, Central San Joaquin Water Conservation District's counsel states that this case was previously before this Court as *Stockton East Water District v. United States*, No. 2007-5142, decided September 30, 2009.  Plaintiff-Appellant's counsel states that he is unaware of any other case pending in this Court or the United States Court of Federal Claims that may be directly affected by this Court's decision on appeal.

**Jurisdictional Statement**

The United States Court of Federal Claims possessed jurisdiction to entertain the case in the trial court under 28 U.S.C. § 1491(a).  On February 28, 2013, the trial court issued a final order and decision awarding to Plaintiff-Appellant cost-of-cover damages but denying all expectation damages.  Central timely filed its notice of appeal on April 8, 2013; the appeal was docketed April 10, 2013.  Central requested, and was granted, a 30-day enlargement of time to file Central's opening brief on May 22, 2013.  This Court has jurisdiction over this appeal under 28 U.S.C. § 1295(a)(3).

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

—————————

2013-5078

—————————

Stockton East Water District,
San Joaquin County, Stockton City,
and California Water Service Company,

Plaintiffs,

and

Central San Joaquin Water Conservation District,

Plaintiff-Appellant,

v.

United States,

Defendant-Appellee.

—————————

**Opening Brief of Plaintiff-Appellant—
Central San Joaquin Water Conservation District**

In the first appeal of this case, this Court held that the United States was
liable for breach of a 1983 water-delivery contract between the Defendant-
Appellee, the United States, and Plaintiff-Appellant, Central San Joaquin Water
Conservation District.  The breach consisted of Reclamation's failure to annually
deliver at least the minimum quantity of 56,000 acre-feet of water in each of the
breach years—1999 through 2004—as required by the contract:

> There is no denying that the quantities of water promised were not
> delivered, and that therefore a breach occurred. This is beyond
> dispute—the evidence is conclusive; the trial court so held; and this
> court affirmed that finding.[1]

This Court then remanded this case to the trial court for a damages determination.[2]

In the damages trial on remand, the parties stipulated to the quantities of

water Reclamation had actually delivered in each of the breach years and the

contract price Central would have paid Reclamation for that undelivered water.

The trial court also determined that the market values of the undelivered water

provided by Central's expert witness were reliable.[3]  But instead of awarding

expectancy damages to Central based on these largely uncontested facts, the trial

court, misinterpreting Article 3(c) of the contract and this Court's but-for causation

test, concluded that Central had failed to prove a completely irrelevant fact:

"[T]hat its farmers plausibly would have taken 56,000 acre-feet of water in each of

the breach years."[4]

But because the breach was Reclamation's failure to deliver the contract

minimum of 56,000 acre-feet in each of the breach years,[5] as required by Article

---

[1] *Stockton East Water Dist. v. United States*, 638 F.3d 781, 783 (Fed. Cir. 2011)
(citing *Stockton East Water Dist. v. United States*, 583 F.3d 1344, 1370 (Fed. Cir.
2009).
[2] *Stockton East Water Dist.*, 583 F.3d at 1369.
[3] JA29.
[4] JA27.
[5] *Stockton East Water Dist.*, 583 F.3d at 1351 (emphasis in original).

3(c) of the contract,[6] the only plausible non-breach scenario was for Reclamation to deliver that quantity. The trial court's holding that Reclamation could, without breaching the contract (that is, in the non-breach world) still not deliver more to Central than it actually did (in the breach world) nullifies the breach that this Court found.[7] So, the non-breach world must logically have been one in which Reclamation did deliver at least 56,000 acre-feet of water per year, and Reclamation's failure to deliver this annual minimum amount of water is the breach world, not the non-breach world, as the trial court erroneously held.

Fortunately, anticipating this appeal and to avoid the necessity of a retrial, the trial court made findings as to the market value of the undelivered water in each of the breach years, enabling this Court to calculate Central's expectancy damages without a retrial. Central therefore asks this Court to reverse the trial court's denial of expectancy damages, with instructions to enter judgment in Central's favor for expectancy damages in the sum of $13,174,701.79, in addition to the cost-of-cover damages of $149,950 awarded by the trial court, for a total of $13,324,651.79 as damages for Reclamation's breach of the water delivery contract in 1999 to 2004.

---

[6] JA173–JA174.

[7] JA2.

**STATEMENT OF THE ISSUES**

1.      Article 3(c) of the contract required Reclamation to provide and Central to pay for a minimum of 56,000 acre-feet and a maximum of 80,000 acre-feet of water annually.  Reclamation was held liable for breach of the contract for delivering less than the contract minimum in each breach year, but the trial court refused to award expectancy damages for the difference between the contract minimum and the quantity actually delivered.  Did the trial court err?

2.      Article 3(c) required that Central pay for 56,000 acre-feet of water in each of the breach years.  Because Reclamation never delivered the full 56,000 acre-feet in any year, Central only paid for the water Reclamation actually delivered each year.  Did the trial court err in holding that Article 3(c) would not have been enforced if Reclamation had not breached the contract and had, in fact, delivered the contract minimum of 56,000 acre-feet per year?

3.      But for Reclamation's breach, Central would have taken the full contract maximum of 80,000 acre-feet each year, as Reclamation's own analyses of Central's overdrafted aquifer, the engineering report on which Central relied in building a 7.4-million-dollar water delivery system, and testimony from Reclamation that Central could have sold any excess water all confirmed.  Was the trial court clearly erroneous in not awarding expectancy damages on this basis?

4.      In an abundance of caution the trial court determined the market values of the undelivered water in each of the breach years, adopting the expert opinion of Dr. Rodney Smith.  Both the trial court and the Government's own expert found Dr. Smith's methodology reliable.  Should this Court reverse and instruct the trial court to enter judgment for expectancy damages using these market values?

**STATEMENT OF THE CASE**

**1.      Nature of the case**

        This is a suit for breach of a 1983 water-delivery contract between the

United States Bureau of Reclamation and Central San Joaquin Water Conservation

District.  Central is a California state agency that supplies agricultural irrigation

water to farmers in the drought-prone Central Valley of California to alleviate the

4

effects of groundwater overdraft on land and water resources.[8]  In a prior appeal in this case, this Court held that Reclamation had breached Central's contract (and that of co-plaintiff Stockton East Water District as well) by failing to deliver the quantities of water specified in their contracts and remanded for determination of damages.[9]

On remand, the trial court held that Central was entitled to no expectancy damages and awarded Central only cost-of-cover damages of $149,950.[10]  This appeal asks this Court to reverse the portion of the trial court's ruling denying Central all expectancy damages and, since the trial court went ahead and determined the market value of the undelivered water for each of the breach years, instruct the trial court to enter judgment for Central based on those market values.

---

[8] JA1302.

[9] *Stockton East Water Dist.*, 583 F.3d 1344 (2009).

[10] *Stockton East Water Dist. v. United States*, 109 Fed. Cl. 460 (2013) (JA2–JA31). The trial court also entered a separate opinion on the claims of Central's co-plaintiff, Stockton East Water District at *Stockton East Water Dist. v. United States*, 109 Fed. Cl. 760 (2013).  Previous opinions and ruling are reported at: *Stockton East Water Dist. v. United States*, 101 Fed. Cl. 352 (2011) (denying in part the Government's motion to dismiss based on 28 U.S.C. § 1500); *Stockton East Water Dist. v. United States*, 76 Fed. Cl. 497 (2007) (denying plaintiffs' motion for reconsideration); *Stockton East Water Dist. v. United States*, 76 Fed. Cl. 470 (2007) (granting motion for reconsideration or modification); *Stockton East Water Dist. v. United States*, 75 Fed. Cl. 321 (2007) (entering judgment for the Government); *Stockton East Water Dist. v. United States*, 72 Fed. Cl. 141 (2006) (granting in part motion for reconsideration); *Stockton East Water Dist. v. United States*, 70 Fed. Cl. 515 (2006) (granting in part Government's motion for summary judgment); and *Stockton East Water Dist. v. United States*, 62 Fed. Cl. 379 (2004) (denying Government's motion to dismiss).

## 2.   Procedural history

In 1993 Reclamation announced that, due to enactment of the Central Valley Project Improvement Act, which reallocated up to 800,000 acre-feet per year of irrigation water to protect fish species, it would not fulfill its water delivery obligations under Central's 1983 water-delivery contract.[11]  Central and others sued for injunctive and declaratory relief and damages in the U.S. District Court for the Eastern District of California.[12]

The district court transferred this cause of action to the U.S. Court of Federal Claims in 2004.[13]  Central filed its Amended Complaint in April 2004, seeking relief for breach of contract and taking of its water rights.  The Government moved to dismiss, which was denied.[14]  At the request of all the parties the case was bifurcated into a liability phase and a damages phase.  In 2005 cross-motions for summary judgment were filed, and in 2006 trial was held on liability.[15]

Following a seven-day liability trial, the trial court found that Reclamation's failure to provide the minimum quantities of water listed in the Build–Up Schedule violated the requirements of Article 3, but that Reclamation was not liable for

---

[11] JA9–JA10.
[12] JA13.
[13] *Id.*
[14] *See Stockton East Water Dist. v. United States*, 62 Fed. Cl. 379 (2004).
[15] JA13

6

breach because it had a valid excuse under the Contracts for its non-performance.[16]

This Court reversed, holding that Reclamation had breached the contract by failing

to deliver the contract minimum of 56,000 acre-feet in each of the years from 1999

through 2004, and remanded for determination of damages:

> The record establishes and the trial court found as a fact that
> Reclamation failed to provide the water that was promised under the
> 1983 contracts for the years 1994, 1995, and 1999–2004 . . . . Absent
> an affirmative defense, that failure by the Government would
> constitute a breach of the contracts and render the Government liable
> for damages for the breach.[17]

This Court then ruled that Reclamation's nonperformance in the years 1999

through 2004 was not excused, and therefore Reclamation was liable for breaching

the Contracts in those years.  The Government moved for rehearing (and rehearing

en banc), which this Court denied, stating:

> There is no denying that the quantities of water promised were not
> delivered, and that therefore a breach occurred. This is beyond
> dispute—the evidence is conclusive; the trial court so held; and this
> court affirmed that finding.[18]

On remand, the trial court held a damages trial in Sacramento, California,

from September 10, 2012 through September 19, 2012.[19]  The trial court issued its

---

[16] *Stockton East Water Dist. v. United States*, 76 Fed. Cl. 470, 489 (2007); *Stockton East Water Dist. v. United States*, 75 Fed. Cl. 321, 365–66 (2007).

[17] *Stockton East Water Dist.*, 583 F.3d at 1356–1357.

[18] *Stockton East Water Dist.*, 638 F.3d at 783 (citing *Stockton East Water Dist.*, 583 F.3d at 1370).

[19] JA14.

damages opinion on February 28, 2013, holding that Central was entitled to cost-of-cover damages, but no expectancy damages.[20]   Anticipating this appeal, the trial court also made findings of fact that allow this Court to calculate the appropriate expectancy damages due Central in the event of reversal.[21]   The trial court found that "if Central had proved that it was damaged by Reclamation's breach, the proper spot-market price to use in any damages calculation would be that advanced by Dr. Smith."[22]   The trial court explained:

> Dr. Smith examined eighteen one-year water transactions involving water rights originating on the San Joaquin River or its tributaries during the breach period, as well as three from 1998 because no such transactions occurred in 1999. Using those data, Dr. Smith opined that the spot-market value of water was $60 per acre-foot in 1999, $80 in 2000, $90 in 2001, $135 in 2002, $85 in 2003, and $120 in 2004.[23]

Accordingly, if this Court agrees with Central and reverses the trial court's denial of expectancy damages, this Court may easily calculate those damages.

Because the trial court committed reversible error, Central timely filed its notice of appeal on April 8, 2013.  This appeal was docketed on April 10, 2013.  A 30-day enlargement of time to file Central's opening brief was granted, setting July

---

[20] *See generally* JA2–JA31.
[21] JA29–JA31.
[22] JA30.
[23] JA29.

10, 2013 as the filing date for this brief.[24]

## STATEMENT OF THE FACTS

Central San Joaquin Water Conservation District, a California state agency, is a water conservation district organized under the California Water Code. Central was formed to obtain surface water from the Central Valley Project so that water users within Central would not have to rely on groundwater extraction to satisfy their water demands.[25]  Central's primary statutory authority is to "conserve water and water rights for any useful purpose" including the conservation of groundwater.[26]

Excessive groundwater extraction in California's Central Valley has resulted in the severe overdraft of the underlying Eastern San Joaquin Aquifer.[27]  As early as 1911, California identified the Eastern San Joaquin County Groundwater Basin as overdrafted, and in 1980 determined that it was one of eight basins in the state subject to critical conditions of overdraft.[28]  Critical overdraft means the amount of groundwater pumped is not sustainable in the long run.[29]  This critical overdraft, combined with continued pumping in the basin, has caused an underground saline

---

[24] Plaintiff-Appellant's Unopposed Mot. for Enlargement of Time to File Opening Br., Doc. 8-1 (May 22, 2013); Order (granting motion for enlargement of time), Doc. 9 (May 22, 2013).
[25] JA1302.
[26] Cal. Water Code § 74521.
[27] JA193–JA200; JA1288–JA1290; JA1291–JA1293.
[28] JA152.
[29] JA1294.

front to invade the groundwater basin from the west, permanently destroying a

portion of the groundwater resource.[30]  The saline front intrudes eastward, under

the City of Stockton, hundreds of feet each year, threatening the entire basin.[31]

Importation of supplemental surface supplies such as water from the New Melones

unit of the Central Valley Project was seen as essential to restore the basin and stop

the saline intrusion problem.[32]

In 1983, Central and Reclamation entered into a contract that was intended,

following a ten-year buildup period, to provide Central up to 80,000 acre-feet and a

minimum of 56,000 acre-feet of water per year of surface water from the New

Melones Unit of the Central Valley Project.[33]  Characterizing Central's contract as

a "firm commitment" for water delivery, Reclamation sought and received a

modification of its California state water right to allow the filling of New Melones

reservoir—which the State Water Board had so far prohibited.[34]  The California

Water Board, in reliance on Reclamation's firm commitment representation,

amended Reclamation's water permit for New Melones.[35]

Later, as Central prepared in 1990 to accept New Melones water under the

contract, Central needed to determine the type and location of internal distribution

---

[30] JA1294–JA1296.
[31] JA1296.
[32] *See* JA1298–JA1299; JA152.
[33] JA166–JA191.
[34] *See California v. United States*, 438 U.S. 645 (1978).
[35] JA101–JA128.

10

facilities it had to construct.  This required that Central ascertain which of its farmers would actually use New Melones water, and how much they would use. So Central retained the international engineering firm CH2M Hill to determine the type and location of water delivery facilities Central needed to build to deliver water to its farmers, to design a construction plan for those facilities, to meet with Central's growers and speak with them regarding the placement of diversion structures, and to assist Central  in its financing process.[36]  CH2M Hill held several meetings with the farmers, surveyed their lands, and obtained letters of intent signed by farmers stating their intention to use a total of 65,000 acre-feet of New Melones water.[37]  CH2M Hill discounted this total by 20% to 50,000 acre-feet per year, which, because of the thirty percent conveyance loss during transit from New Melones Dam, required over 70,000 acre-feet per year from the reservoir.[38]

In reliance on CH2M Hill's demand analysis, Central's Board approved and adopted the report of CH2M Hill and "authorized the execution of bonds to build the project" totaling $7.4 million.[39]  This was a huge commitment for a district whose annual income at that time did not even equal the $500,000 annual debt service on those bonds.[40]

---

[36] JA1309–JA1310.
[37] JA772–JA803; JA1311.
[38] JA1311; JA1300.
[39] JA1312.
[40] JA1316.

11

Central adopted a carrot-and-stick regulatory approach to encourage its farmers to ensure use of the surface water contracted for and so to reduce groundwater extraction from the aquifer. Among the steps Central took was an increase in the fee Central charges its farmers for groundwater extraction.[41] Central also reduced the surface water price to be well below the groundwater extraction cost.[42] And Central ultimately began defraying the farmers' costs of installing piping and other equipment to receive the surface water via the capital improvement program.[43] Under this program, Central provided farmers a credit on their water bills of up to $150 per acre to defray the capital cost of taking surface water.[44]

As a result of these policies, the demand for surface water among Central's farmers remained high until mid-1993, when the Government held a meeting at which officials announced there would be little or no water forthcoming under Central's contract. As Central's General Counsel Reid Roberts testified:

> A.    [A]t the meeting, Frank Dimmick I believe his name is and Wayne White, Dimmick was there representing the Bureau [of Reclamation], Mr. White was there representing Fish and Wildlife Service, spoke about what had transpired over the past year and basically said there was not going to be any water to honor the contracts it had to make.[45]

---

[41] *See* JA1314–JA1315.

[42] *See* JA1324; JA1301; JA1333 (allowing Durbin's testimony).

[43] *See* JA1330.

[44] JA1330

[45] JA1319.

This was a game-changer. Having just completed construction of the $7.4 million water delivery facilities, Central's Board was (if not outraged) greatly discouraged.[46] The same year, Central filed suit in federal court for the Government's breach of the contract in district court, seeking a preliminary injunction to compel water deliveries.[47]

As feared, from 1993 onward Reclamation did not deliver to Central the quantities of water specified in Article 3 of the contract—between 56,000 and 80,000 acre-feet per year. The trial court found (and this Court affirmed) the quantities actually delivered to Central and each of the breach years (1999–2004), and the parties stipulated to the price Central would have paid Reclamation per acre-foot in each year:[48]

| Year | Quantity Delivered (in acre-feet) | Contract Price |
|------|-----------------------------------|----------------|
| 1999 | 33,789 | $9.24 |
| 2000 | 27,759 | $10.44 |
| 2001 | 25,750 | $11.14 |
| 2002 | 10,503 | $10.53 |
| 2003 | 9,844 | $11.85 |
| 2004 | 13,605 | $13.67 |

As determined by the trial court, these contract prices were far below the market value of this water.[49] The market values for each of the breach years, as found by the trial court, were:

---

[46] JA1320.
[47] JA13; JA76.
[48] *Stockton East Water Dist.*, 583 F.3d at 1353; JA76–JA78.
[49] JA29–30.

| Year | Market Value (per acre-foot) |
|------|------------------------------|
| 1999 | $60 |
| 2000 | $80 |
| 2001 | $90 |
| 2002 | $135 |
| 2003 | $85 |
| 2004 | $120 |

Central's expectancy damages (difference between the market value and the contract price for the undelivered quantity below 56,000 acre-feet) were thus $13,174,701.79:

| Year | Spot market price of water per acre-foot | Amount Central would have paid Reclamation per acre-foot | Difference between market price and Reclamation's price per acre-foot | Quantity of water not delivered (in acre-feet) | Damages |
|------|------|------|------|------|------|
| 1999 | $60 | $9.24 | $50.76 | 22,214 | $1,127,582.64 |
| 2000 | $80 | $10.44 | $69.56 | 28,241 | $1,964,443.96 |
| 2001 | $90 | $11.14 | $78.86 | 30,250 | $2,385,515.00 |
| 2002 | $135 | $10.53 | $124.47 | 15,497* 10,000** | $1,928,911.59 $44,700.00 |
| 2003 | $85 | $11.85 | $73.15 | 31,155* | $2,278,988.25 |
| 2004 | $120 | $13.67 | $106.33 | 32,395* | $3,444,560.35 |
| **Total** | | | | | **$13,174,701.79** |

*  These quantities have been reduced to account for the quantities of water Central purchased from SSJID, for which Central received cost-of-cover damages.

** In 2002 Central could have purchased an additional 10,000 acre-feet from SSJID, for which the damages are $4.47 per acre-foot or a total of $44,700.

14

**SUMMARY OF THE ARGUMENT**

Article 3(c) of the contract required Reclamation to deliver a minimum of 56,000 acre-feet and a maximum of 80,000 acre-feet of water annually to Central in each of the breach years, and Article 5 required Central to pay for that minimum quantity.[50]  Reclamation's breach of contract, for which damages were to be assessed, was its failure to deliver to Central this specified quantity, between 56,000 and 80,000 acre-feet, in each of the breach years.

But the trial court misinterpreted Article 3(c), reducing its maximum annual delivery requirement from 80,000 acre-feet to 56,000 acre-feet and eliminating the minimum delivery requirement altogether.  The trial court also read Central's take-or-pay requirement entirely out of the contract on the ground that it would not be enforced anyway.  It was this fatal misinterpretation that ultimately misled the trial court into denying expectancy damages to Central.

Applying its misinterpretation of the contract in a pretrial ruling, the trial court erroneously ordered that Central's damages at trial would be capped at 56,000 acre-feet and that Central would not be allowed expectancy damages for Reclamation's failure to deliver up to 80,000 acre-feet (the contract maximum for each of the breach years).[51]

---

[50] JA166–JA192.

[51] Central respectfully objected to this ruling thus preserving this issue for appeal.

15

Compounding its error, the trial court also defined Central's burden of proof at trial to completely ignore Article 3(c)'s minimum delivery requirement. Instead, the trial court predicated its denial of expectation damages on the mostly irrelevant issue of how much water Central's farmers might have requested had they not been discouraged by Reclamation's poor record of water deliveries: "Central's burden is to make a reasonable showing of how much of the 56,000 acre-feet per year minimum it would have requested and scheduled but for Reclamation's poor performance in delivering shortfalls that discouraged Central's farmers from making requests that reflected their anticipated needs."[52] Since Central had no formal procedure for farmers to make such requests, this burden of proof was not only irrelevant but practically impossible.

The trial court's damages decision turns both Article 3(c) and this Court's liability holding on their heads. For this Court had already held that the breach of contract (whose damages were the subject of this trial) was Reclamation's failure to deliver to Central the contract minimum of 56,000 acre-feet of water in each of the six relevant years as required by Article 3(c):

> There is no denying that the quantities of water promised were not delivered, and that therefore a breach occurred. This is beyond dispute—the evidence is conclusive; the trial court so held; and this court affirmed that finding.[53]

---

[52] JA93.

[53] *Stockton East Water Dist.*, 638 F.3d at 783 (citing *Stockton East Water Dist.*, 583 F.3d at 1370).

16

The trial court, unnecessarily complicating the case, failed to recognize that this is a contract for sale of a specified quantity of goods (specifically, water), and the measure of damages is the difference between the contract price and the market value of the undelivered water:

> The usual measure of damages for the failure to deliver goods is the difference between the contract price the buyer was to pay and the fair market value of those goods.[54]

Since Reclamation had to deliver at least 56,000 acre-feet annually to avoid a breach, it was nonsensical for the trial court to require that Central prove how much water, up to a ceiling of 56,000 acre-feet, Reclamation would have delivered in the non-breach world.  The only way Reclamation could have avoided breach was to deliver the contract minimum 56,000 acre-feet annually.  Any lesser delivery was a breach of Article 3(c)—and thus could not exist in the non-breach world.  The non-breach world required delivery of at least the 56,000 acre-foot contract minimum of Article 3(c), and the trial court erred in accepting Reclamation's argument that deliveries below this minimum could define the non-breach world.

---

[54] *Everett Plywood Corp. v. United States*, 206 Ct. Cl. 244, 258 (1975) (citing *Dulien Steel Products, Inc. v. United State*s, 143 Ct. Cl. 484 (1958)); McCormick, Damages § 175 (1935); Uniform Commercial Code § 2-713.

17

Even though it should not have been required to do so, Central introduced substantial evidence at trial that Central would have requested and its farmers would have used more than the 56,000 acre-foot minimum and in fact would have used all of the water Reclamation could have delivered to Central—up to 80,000 acre-feet of water annually—during the breach years. Central's farmers use an average 160,000 acre-feet of water per year. In addition, Central's expert witness testified that Central could have sold any excess water that its farmers did not need in the San Joaquin water market during the breach years. In short, the evidence amply proved that it would have been folly for Central to have simply paid for—and not actually taken—the water it was contractually obligated to pay for and entitled to take under the contract.

Having proved both the quantity of water Reclamation failed to deliver and its market value in each of the breach years (1999–2004), Central satisfied its burden of proof under the facts of this case. But instead of calculating damages based on this nearly uncontested evidence, the trial court concluded that Central had not met its erroneous burden of proof, and denied Central all expectation damages, awarding instead only nominal cost-of-cover damages. But because Central should not have been required to meet the burden of proof imposed on it by the trial court—which was based on its misreading of Article 3(c)—the trial court's denial of expectancy damages should be reversed.

18

Finally, because the trial court made findings of the per-acre-foot market value of the undelivered water, enabling this Court to accurately calculate Central's expectancy damages, this Court should reverse the trial court's denial of expectancy damages and instruct the trial court to award Central expectancy damages in the amount of $13,174,701.79 together with the cost-of-cover damages already awarded by the trial court.

**Standard of Review**

Under its familiar standards, this Court reviews the trial court's legal conclusions without deference,[55] and its factual findings for clear error.[56] This Court reviews contract interpretation, such as the meaning of Article 3(c), as a question of law without deference.[57] Whether Article 3(c) created a minimum delivery requirement of 56,000 acre-feet annually for each of the breach years is thus a legal issue of contract interpretation reviewed by this Court de novo.[58]

Similarly, this Court has established the standard for proving breach-of-contract damages:

> A plaintiff must show that but for the breach, the damages alleged would not have been suffered. *See Standard Havens Prod., Inc., v.*

---

[55] *Yankee Atomic Elec. Co. v. United States,* 536 F.3d 1268, 1272 (Fed. Cir. 2008).
[56] *Indiana Michigan Power Co. v. United States,* 422 F.3d 1369, 1373 (Fed. Cir. 2005).
[57] *Yankee Atomic Elec. Co.,* 536 F.3d at 1272.
[58] *San Carlos Irrigation & Drainage Dist. v. United States,* 877 F.2d 957, 959-60 (Fed. Cir. 1989) (citing *George Hyman Constr. Co. v. United States,* 832 F.2d 574, 579 (Fed. Cir. 1987)).

19

*Gencor Indus., Inc.,* 953 F.2d 1360, 1374, 21 USPQ2d 1321, 1332–33 (Fed. Cir. 1991) (quoting *United Indus. Syndicate, Inc. v. Western Auto Supply Co.,* 686 F.2d 1312, 1316 (8th Cir. 1982) ("The fundamental measure of contract damages is that which places the nonbreaching party in the position it would have been but for the breach.")); *Fawick Corp. v. United States,* 149 Ct. Cl. 623, 626–27 (1960).[59]

In a case like this, where the breach consists of the failure to deliver goods (here, water), this Court has established a straightforward measure of damages:

> The usual measure of damages for the failure to deliver goods is the difference between the contract price the buyer was to pay and the fair market value of those goods.[60]

This Court has shown a preference for using the "but for" standard to prove causation of expectancy damages.[61]  Under this standard, a plaintiff must demonstrate "what might have been . . . ."[62]  By comparing the "but for" world with what actually occurred, plaintiffs can show what loss was caused by the breach.  Once causation is established, "it is not essential that the amount [of damage] be ascertainable with absolute exactness or mathematical precision:  'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair

---

[59] *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1563 (Fed. Cir. 1997).

[60] *Everett Plywood Corp.*, 206 Ct. Cl. at 258 (1975) (citing *Dulien Steel Products, Inc.*, 143 Ct. Cl. 484 (1958)); McCormick, Damages § 175 (1935); Uniform Commercial Code § 2-713.

[61] *See Yankee Atomic Electric Co.*, 536 F.3d at 1272 (stating that the alternative substantial factor causation test is not preferred).

[62] *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1380 (Fed. Cir. 2001).

and reasonable approximation.'"[63]  Because the nature of the breach—

Reclamation's failure to deliver at least 56,000 acre-feet in each of the breach

years—has already been established, this Court reviews the trial court's but-for

causation analysis de novo as a matter of law.[64]

## ARGUMENT

### I.    The trial court's misinterpretation of Article 3(c) of the contract caused it to erroneously conclude that Central was entitled to no expectancy damages for Reclamation's breach

Article 3(c) of Central's contract with Reclamation requires Reclamation to

make available and Central to pay for a minimum of 56,000 and up to a maximum

of 80,000 acre-feet of water in each year commencing with year nine (1997).  So

for each of the breach years 1999–2004 (years eleven through sixteen of the

contract) Reclamation was obligated to provide and Central was obligated to pay

for at least 56,000 acre-feet of water regardless of whether Central actually

requested that quantity or not.  The contract states:

> The United States shall make available to the Contractor the annual
> quantities of agricultural water, up to a maximum quantity of 80,000
> acre-feet, as specified in the schedule submitted by the Contractor in

---

[63] *Bluebonnet Savings Bank, FSB v. United States,* 266 F.3d 1348, 1355 (Fed. Cir. 2001) (citing *Elec. & Missile Facilities, Inc. v. United States,* 189 Ct. Cl. 237, 257 (1969) (internal citation omitted)); *see also Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562 (1931) ("The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.").

[64] *Ind. Mich. Power Co.*, 422 F.3d at 1373.

21

accordance with Article 4 and the Contractor shall pay for said water in accordance with Article 5: Provided, That the United States shall make available and the Contractor shall pay for, as a minimum, such quantities of· agricultural water as specified below:

* * *

[F]or years nine and 10 the minimum quantity of 56,000 acre-feet . . . Each year beginning in the eleventh year and continuing for the remaining contract term the quantity of water scheduled in the eleventh year, which quantity shall be at least equal to or greater than the quantity made available and paid for in the tenth year . . . .[65]

As this Court earlier interpreted this provision: "Article 3 also establishes for each year of the contract a *minimum* amount of water that Reclamation is obligated to make available, and for which the Districts must pay . . . ."[66] In fact it was Reclamation's failure to deliver this annual minimum 56,000 acre-feet that this Court determined (in the prior appeal) to be a breach of the contract:

There is no denying that the quantities of water promised were not delivered, and that therefore a breach occurred. This is beyond dispute—the evidence is conclusive; the trial court so held; and this court affirmed that finding.[67]

But in making its damages determination on remand, the trial court confused the 56,000 acre-feet annual minimum delivery requirement with the requirement that Reclamation deliver up to 80,000 acre-feet of water annually (which was not a

---

[65] JA173–JA174.

[66] *Stockton East Water Dist.* 1351 (emphasis in original).

[67] *Stockton East Water Dist.*, 638 F.3d at 783 (citing *Stockton East Water Dist.*, 583 F.3d at 1370).

minimum), thus reading Reclamation's minimum annual delivery requirement and

Central's take-or-pay requirement right out of the contract.  The trial court ruled

that Central was only entitled to "up to" 56,000 acre-feet (not up to 80,000 as the

contract states), and must prove how much of that 56,000 acre-feet it would have

requested (adding a new condition not required by the contract at all).  This

misinterpretation of a key contract provision is reversible, legal error.

> **A.    The trial court erroneously misinterpreted Article 3(c), which
> required Reclamation to provide a minimum of 56,000 acre-feet of
> water per year to Central, to instead require only that
> Reclamation provide "up to" that quantity if requested
> by Central**

Originally the trial court correctly interpreted Article 3(c) to unconditionally

obligate Reclamation to provide the 56,000 acre-foot minimum in each breach

year—an interpretation that this Court confirmed in the prior appeal:

> This court previously found that Article 3 not only obligated
> Reclamation to provide the minimum amounts of water listed in the
> Build–Up Schedule, but also required each district to purchase such
> amounts of water. *Stockton I,* 75 Fed. Cl. at 365 (referring to the
> Build–Up Schedule as a "minimum purchase and supply schedule").
> The Federal Circuit affirmed that finding. *Stockton III,* 583 F.3d at
> 1351 ("Article 3 also establishes for each year of the contract a
> *minimum* amount of water that Reclamation is obligated to make
> available, and for which the Districts must pay[.]").[68]

Article 3(c) required Reclamation to deliver a minimum of 56,000 acre-feet

of water annually because Central unquestionably needed this amount of water

---

[68] JA6.

every year.  The undisputed fact is that Central—a water conservation district formed to combat groundwater depletion in the Eastern San Joaquin Aquifer— desperately needed that water.  As the parties stipulated in the trial court, "[d]epleted groundwater and the need for surface water as both an alternative source and as a means of avoiding further depletion of groundwater were reasons that Stockton East and Central entered into the 1983 Contracts."[69]

The Commissioner of Reclamation, in seeking approval of Central's contract, informed the Secretary of Interior that "[s]upplemental water is needed to alleviate the present ground water overdraft conditions as the water levels continue to decline in this area,"[70] going on to state "Although ground water constitutes a major source of the district's water supply, the ground water is in a state of overdraft.  As a result of the overdraft, water levels are declining, land subsidence has occurred, and intrusion of brackish water from the west has taken place."[71]

But shortly before the damages trial, the trial court reversed its position, ruling that Reclamation did not have the unconditional obligation to deliver the contract minimum 56,000 acre-feet but only so much of that minimum as Central would have requested and scheduled:    "Central's burden is to make a reasonable

---

[69] JA80.
[70] JA195.
[71] JA195–JA196.

24

showing of how much of the 56,000 acre-feet per year minimum it would have

requested and scheduled. . . .[72]

Requiring Central to show how much it would have scheduled is all the

more peculiar in light of the trial court's earlier ruling (affirmed by this Court) that

Central was not required to submit schedules at all:

> The Federal Circuit affirmed, and the parties did not further dispute, this court's ruling that the districts' failure to submit schedules did not excuse any breach of contract by Reclamation. See *Stockton III,* 583 F.3d at 1352.[73]

Because Central was unconditionally entitled to delivery of the contract

minimum 56,000 acre-feet per year, without any precondition that Central submit a

schedule or request for it, the correct baseline for calculating Central's damages

was the difference between the contract minimum and the quantity Reclamation

actually delivered.  The trial court's denial of expectancy damages on the ground

that Central had failed to satisfactorily prove how much water, up to 56,000 acre-

feet, it would have requested or scheduled betrays the trial court's utter

misunderstanding that the contract required Reclamation to deliver this amount—

whether Central requested it or not.

The trial court thus made this damages case more complicated than it had to

be.  In a case like this, where the breach consists of the failure to deliver goods

---

[72] JA93.
[73] JA7.

(here, water), the measure of damages is straightforward, being the difference

between the contract price and the fair market value of the undelivered goods:

> The usual measure of damages for the failure to deliver goods is the
> difference between the contract price the buyer was to pay and the fair
> market value of those goods.[74]

This is, in fact, the same rule stated in Uniform Commercial Code § 2-713:

> [T]he measure of damages for non-delivery or repudiation by the
> seller is the difference between the market price at the time when the
> buyer learned of the breach and the contract price together with any
> incidental and consequential damages provided in this Article (Section
> 2-715), but less expenses saved in consequence of the seller's
> breach.[75]

Because the trial court misinterpreted Article 3(c), stripping it of its plain

and intended meaning, the trial court's damages decision that flows from this

erroneous contract interpretation should be reversed.

### B.  The trial court's misinterpretation of Article 3(c) led it to erroneously ignore that the breach was Reclamation's failure to deliver the full contract minimum of 56,000 acre-feet

The general rule in common law breach of contract cases is to award

damages sufficient to place the injured party in as good a position as he or she

would have been had the breaching party fully performed.[76]  As this Court has

explained, the law seeks to make "the non-breaching party whole" by giving him

---

[74] *Everett Plywood Corp.*, 206 Ct. Cl. at 258 (1975) (citing *Dulien Steel Products, Inc.*, 143 Ct. Cl. 484 (1958)); McCormick, Damages § 175 (1935); Uniform Commercial Code § 2-713.

[75] U.C.C. § 2-713(1).

[76] *Estate of Berg v. United States,* 231 Ct. Cl. 466, 466 (1982).

"the benefits he expected to receive had the breach not occurred."[77]  Here, Central

was entitled to be made whole by recovering the benefits it expected to receive

from this contract—that is, the value of the 56,000 acre-feet per year contract

minimum that Reclamation failed to deliver in 1999 through 2004 and which

Central would have distributed to its farmers or sold, and used as in-lieu recharge

water.

In cases like this, "where responsibility for damages is clear, it is not

essential that the amount thereof be ascertainable with absolute exactness or

mathematical precision . . . ."[78]  So, where liability has been determined, the

plaintiff in a breach-of-contract case "bears the burden of propounding a realistic

but-for scenario . . . ."[79]

To construct a proper comparison between the breach and non-breach

worlds requires a proper understanding of what the breach was.  Here, initially the

trial court correctly defined Reclamation's breach as its failure to deliver the

quantities of water specified in Article 3(c):  "Reclamation breached the Contracts

in the years 1999 to 2004 when it failed to provide specified volumes of water to

plaintiffs."[80]  In fact, both the trial court and this Court defined Reclamation's

---

[77] *California Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1349 (Fed. Cir. 2001).
[78] *Electronic & Missile Facilities, Inc.*, 189 Ct. Cl. at 257.
[79] *Coast Fed. Bank, FSB*, 48 Fed. Cl. at 430 n. 25.
[80] JA2.

27

breach as failure to deliver the quantity shown in the build-up schedule:

> According to the case that Central tried, the breach was the failure to deliver the difference between the annually delivered volume and the Build-Up Schedule, which figures were adopted by the Federal Circuit.[81]

That volume, as stated in Article 3(c) and as shown in the build-up schedule published in this Court's prior opinion,[82] is for 56,000 acre-feet for each of the breach years.

The correct non-breach scenario has Reclamation delivering between 56,000 and 80,000 acre-feet in each of the breach years, and the breach scenario (with which it is compared) shows Reclamation delivering less than that amount (as the parties stipulated):

| Year | Non-Breach World Contract Minimum Delivery (acre-feet)[83] | Breach World Quantity Actually Delivered (acre-feet)[84] |
|---|---|---|
| 1999 | 56,000 | 33,789 |
| 2000 | 56,000 | 27,759 |
| 2001 | 56,000 | 25,750 |
| 2002 | 56,000 | 10,503 |
| 2003 | 56,000 | 9,844 |
| 2004 | 56,000 | 13,605 |

So the trial court's conclusion that the non-breach scenario should show Reclamation delivering only 33,789 acre-feet in 1999, 27,759 in 2000, and so forth

---

[81] JA1342–JA1343.

[82] *Stockton East Water Dist.*, 583 F.3d at 1352.

[83] *Id.*

[84] *Stockton East Water Dist.*, 583 F.3d at 1353; JA76–JA78.

28

in each of the subsequent breach years (that is, the exact amount Reclamation actually delivered) makes the breach and non-breach scenarios identical. These are not the quantities specified in the contract (56,000 acre-feet for each of the breach years). As this Court stated:

> [T]he Districts and Reclamation have binding contracts for specified quantities of water which Reclamation is obligated to provide. As the trial court found, Reclamation failed to provide those specified quantities in the years at issue.[85]

Treating the breach and non-breach scenarios as identical also nullifies this Court's prior holding that Reclamation's failure to deliver the 56,000 acre-foot minimum is the breach for which damages are to be measured:

> There is no denying that the quantities of water promised were not delivered, and that therefore a breach occurred. This is beyond dispute—the evidence is conclusive; the trial court so held; and this court affirmed that finding.[86]

The trial court's contract misinterpretation caused it to err in determining damages. Instead of assessing damages for the undelivered water—the difference between 56,000 acre-feet and the amount actually delivered each year—the trial court concluded that Reclamation had actually delivered all the water it was required to, so Central suffered no expectancy damages. This was legal error and should be reversed.

---

[85] *Stockton East Water Dist.*, 583 F.3d at 1369.
[86] *Stockton East Water Dist.*, 638 F.3d at 783 (citing *Stockton East Water Dist.*, 583 F.3d at 1370).

29

**C.**    **The trial court misinterpreted this Court's standard for proving expectancy damages by requiring that Central prove how much water its farmers would have requested—which was not a contract requirement**

The trial court's misinterpretation of Article 3(c) sent the court and the parties on a wild goose chase to try to prove the entirely irrelevant question of how much water Central's farmers would have requested if Reclamation's breaches had not discouraged them from making requests—even though no formal request procedure existed and even though Reclamation was obligated to deliver and Central was obligated to pay for the contract minimum of 56,000 acre-feet every year. The trial court imposed this new burden of proof shortly before trial: "Central's burden is to make a reasonable showing of how much of the 56,000 acre-feet per year minimum it would have requested and scheduled but for Reclamation's poor performance in delivering shortfalls that discouraged Central's farmers from making requests that reflected their anticipated needs."[87]

The trial court then denied Central expectancy damages, holding that it had not met this spurious burden of proof:

> Central has not adduced persuasive evidence demonstrating how much New Melones water its farmers, having made the required financial investment, plausibly might have requested in the 1999–2004 non-breach world where Reclamation made full allocations under the 1983 Contract, and it accordingly has not demonstrated that

---

[87] JA93.

its farmers plausibly would have taken 56,000 acre-feet of water in each of the breach years.[88]

The trial court's erroneous definition of Central's burden of proof, focusing as it did on the irrelevant issue of the extent to which Central's farmers were discouraged from making water requests, reflects three errors in the trial court's reading of the contract. First, the trial court erroneously read out of the parties' water-delivery contract Reclamation's minimum delivery requirement of 56,000 acre-feet in each of the breach years and the related requirement that Central pay for the contractually defined minimum amount (56,000 acre-feet) of water in each of the breach years, regardless of the amount of water (if any) requested by Central's farmers. But Central had no procedure for farmers to make such water requests before Reclamation announced how much water was going to be allocated, and the announcement that Reclamation would not deliver the contracted-for amount of water reduced what requests were made:

> A.    I am not aware of someone that came forward and said I didn't get supplied with water. But I think it goes back to the planning for the year as to who was going to request water based upon what was available and the attitude of the farmers in the area because of inconsistent delivery.
> Q.    So what you're saying is you might not have received a request for water that you would have otherwise received.
> A.    Yes.[89]

---

[88] JA27.
[89] JA1329.

Second, the trial court ignored that the breach, as this Court previously defined it, was Reclamation's failure to deliver the contract minimums promised by Article 3(c):

> There is no denying that the quantities of water promised were not delivered, and that therefore a breach occurred. This is beyond dispute—the evidence is conclusive; the trial court so held; and this court affirmed that finding.[90]

Finally, the trial court ignored that requests and schedules are not a part of the contract minimum requirements, as both the trial court and this Court have already ruled:

> The Federal Circuit affirmed, and the parties did not further dispute, this court's ruling that the districts' failure to submit schedules did not excuse any breach of contract by Reclamation. See *Stockton III,* 583 F.3d at 1352.[91]

## II.    Central presented ample evidence of farmer demand for 56,000 acre-feet per year and the trial court's contrary finding is clearly erroneous

Central presented ample evidence it could have used at least 56,000 acre-feet of water in each of the breach years, even under the trial court's misinterpretation of Article 3(c) and erroneous burden of proof.  So Central should have recovered damages for Reclamation's failure to provide that quantity of water each year.  The trial court's failure to award Central any expectation damages at all was reversible error.

---

[90] *Stockton East Water Dist.*, 638 F.3d at 783.
[91] JA7.

The overwhelming weight of the evidence Central produced demonstrated that Central would have taken the minimum allocation of 56,000 acre-feet in each of the breach years even if Reclamation had not been contractually obligated to deliver it as a minimum.  First, Central (as the Government has stipulated) needed the surface water from New Melones as promised in its contract with Reclamation to alleviate groundwater depletion.[92]  Second, Articles 3(c) and 5 of the contract required Central to pay for a minimum of 56,000 acre-feet in each of the breach years.[93]  Third, all previous surveys and forecasts showed that Central's farmers would use at least a net amount of 50,000 acre-feet of New Melones water.[94] Finally, Central could have sold any surplus for a significant profit.[95]

Reclamation's contractual duty to provide 56,000 acre-feet per year and its breach of contract consisting of Reclamation's failing to do so were established in the 2006 liability trial and the 2009 appeal.  Central should not have had to put on any further evidence on these established and decided issues at the damages trial in 2012.  But the trial court instead erroneously imposed on Central a new burden of proof for the damages trial:  "Central's burden is to make a reasonable showing of how much of the 56,000 acre-feet per year minimum it would have requested and scheduled but for Reclamation's poor performance in delivering shortfalls that

---

[92] JA75.
[93] JA173–174; JA177.
[94] JA1304.
[95] JA1331; JA1321.

discouraged Central's farmers from making requests that reflected their anticipated needs."[96]

That burden, as the trial court explained, was to show how much additional water (up to the 56,000 acre-feet per year minimum) Central would have taken, and the cover price for that water:

> [W]hile Central was entitled to delivery up to the minimum quantity for each of the breach years, damages are measured by what occurred in the breach world, i.e., how much of the quantity scheduled and not delivered did Central obtain, or would Central have obtained if feasible, from other sources and at what price, and in the non-breach world, i.e., how much more of the annual minimum would Central have requested and scheduled in the absence of Reclamation's breach and at what price was that water available. This illustrates one example of the "but for" world for foreseeable damages that a plaintiff is allowed to demonstrate.[97]

Although Central objected to the trial court's imposition of this burden, Central met the burden imposed on it. Central presented ample evidence showing that Central would have requested and accepted every drop of surface water it could get from New Melones—far more than 56,000 acre-feet of water annually. But the trial court found that even this was not enough—although the Government presented no credible evidence to rebut it. The trial court's imposition of this new liability burden and holding that the evidence Central adduced could not meet this burden were both erroneous.

---

[96] JA93.

[97] JA91.

## A.    Central needed the full 56,000 acre-feet per year to alleviate groundwater depletion

Central—a water conservation district formed to combat groundwater

depletion in the Eastern San Joaquin Aquifer—desperately needed the water

Reclamation had to provide under the contract.  As the parties stipulated,

"[d]epleted groundwater and the need for surface water as both an alternative

source and as a means of avoiding further depletion of groundwater were reasons

that Stockton East and Central entered into the 1983 Contracts."[98]  The

Commissioner of Reclamation, in seeking approval of Central's contract, informed

the Secretary of Interior that "[s]upplemental water is needed to alleviate the

present ground water overdraft conditions as the water levels continue to decline in

this area,"[99] going on to state (discussing Stockton East immediately to the north of

Central and also overlying the Eastern San Joaquin Aquifer) that the severe

overdraft is causing declining water levels, land subsidence, and saltwater

contamination:

> Although ground water constitutes a major source of the district's
> water supply, the ground water is in a state of overdraft.  As a result of
> the overdraft, water levels are declining, land subsidence has
> occurred, and intrusion of brackish water from the west has taken
> place.[100]

---

[98] JA75.

[99] JA195.

[100] JA195–JA196.

35

As Central's hydrology expert, Timothy Durbin, testified, Central overlies the Eastern San Joaquin Groundwater Basin, which has experienced declining groundwater levels and overdraft caused by agricultural development.[101]  Durbin's testimony was uncontradicted.  Because of this overdraft, saline water from the Sacramento-San Joaquin Delta and the lower reaches of the San Joaquin River have intruded on the aquifer, filling in the empty space where freshwater has been pumped out.[102]

Durbin further testified that Central's farmers use an average of about 160,000 acre-feet of water each year.[103]  The 56,000 acre-feet per year that Reclamation was contractually obligated to provide would have alleviated the strain on the groundwater supply.  The trial court itself described the disastrous effects of over-pumping groundwater:

> Ground water is virtually a non-viable resource for plaintiffs and other water users in the CVP; indeed, it is depleted to the extent of salt intrusion, which, if left unchecked, could result in the destruction of viable farmland.[104]

As Central's General Counsel, Reid Roberts, who negotiated the 1983 contract for Central, testified, the Government's own Folsom South and New

---

[101] JA1288–JA1290, JA1291–JA1293.
[102] JA1290–JA1291.
[103] JA1297.
[104] *Stockton East Water Dist.*, 75 Fed. Cl. at 374.

Melones studies demonstrated there was a groundwater overdraft and that Central

needed 80,000 acre-feet per year to address that overdraft:

> A.    [T]hose studies indicated and supported our position that
> there was an overdraft in the area, and they indicated that our
> requirement was approximately 80,000 acre-feet of supplemental
> supply to address that overdraft.
> Q.    I'm sorry.  Who indicated?
> A.    Well, the United States did both in the Folso[m] South
> Canal investigation and in their New Melones investigation.[105]

To make sure that the Government fully knew of Central's need for surface

water to combat groundwater overdraft, during contract negotiations Reid Roberts

made clear to Merv DeHaas and Betty Riley, Reclamation's negotiators, that "there

was an overdraft in the area,"[106] and that Central required "approximately 80,000

acre-feet of supplemental supply to address that overdraft."[107]

Roberts also testified that because Central needed New Melones water to

ameliorate the adverse effects of overdraft, Central would have taken all the water

the Government would have provided in each of the breach years.[108]

**B.    Because Central was contractually required to pay for 56,000
acre-feet of water each year, Central would have taken
that amount at minimum**

As this Court recognized, Central's contract is a take-or-pay contract that

obligates Central to pay for 56,000 acre-feet of water every year:  "Article 3 also

---

[105] JA1304.
[106] JA1304.
[107] JA1304.
[108] JA1321–1322.

establishes for each year of the contract a *minimum* amount of water that Reclamation is obligated to make available, and for which the Districts must pay . . . ."[109]

Because Central was contractually obligated to pay Reclamation for 56,000 acre-feet, Central would have taken that amount. Roberts testified that if the water could not be used in the District, then Central could sell it:

> Q.    If, for any reason, Central had not been able to use the water within the District, did you have any other options for use of that water?
>
> A.    Our plans were to utilize all of the water within the District, but had we been able to sell it to others and that would have been approved, then we would have done that.[110]

Central's expert in water markets, Dr. Rodney Smith, testified that there was an active water market in the San Joaquin Valley. This market is a "spot-market," where holders of water rights will sell part or all of those rights for a one-year period:

> Q.    Would you please describe that market.
>
> A.    Sure.[  ]Actually, in the San Joaquin Valley there is certainly a spot market which, as an economist, we see one year agreements. If I may use some of my, tell you how I'm using some of this language? Really, one year agreements. There's other transactions in the marketplace that may be for more than one year, maybe a 10 year lease. There are also transactions that actually involve the sale of contractual entitlements, which most people would say water rights. So all that is happening in the San Joaquin Valley.[111]

---

[109]  *Stockton East Water Dist.*, 583 F.3d at 1351 (emphasis in original).
[110]  JA1323.
[111]  JA1331–JA1332.

38

Articles 3(c) and 5 obligated Central to pay for 56,000 acre-feet of water whether or not the water was delivered.  But having paid for those 56,000 acre-feet, Central would be entitled to those 56,000 acre-feet.  It would have been folly for Central to forego its contractual entitlement—which it was required to pay for anyway— when this water was in such demand both within and outside the District.

Finally, the trial court's conclusion that "Reclamation did not enforce the 'take or pay' provision with respect to Central" proves nothing.[112]  It is true that Reclamation, having failed to deliver 56,000 acre-feet to Central in any of the breach years, did not bill Central for 56,000 acre-feet.  But this does not prove that Reclamation, had it delivered the contract minimum 56,000 acre-feet, would not have billed Central for that amount.

There was absolutely no evidence—and the trial court made no finding— that Reclamation waived its right to full payment for the contract minimum (as long as Reclamation delivered it), nor that Central waived its right to delivery of that contract minimum of 56,000 acre-feet per year.  To the contrary, Central filed suit to compel deliveries in 1993 and that suit was still pending when this cause of action was transferred to the Court of Federal Claims in 2004.[113]

---

[112] JA6.
[113] JA13.

### C.    All Government and engineering studies forecast that Central would use at least a net amount of 50,000 acre-feet each year

All of the surveys and forecasts conducted by both the Government and Central throughout the negotiation, planning, and construction of water delivery facilities concluded:  Central needed and its farmers would use a net amount of 50,000 acre-feet per year or more.  To compensate for the 30% conveyance loss as water transited from New Melones to the District,[114] this would require Central to procure over 71,000 acre-feet annually from New Melones (which the Government rounded to 80,000).[115]

The Government also represented to California that it had a firm commitment to deliver a minimum of 56,000 and up to 80,000 acre-feet annually to Central,[116] and the State accepted this representation by amending Reclamation's water permit for New Melones.[117]  There is no evidence, in the pre-1993 period before Reclamation announced there would be little or no water for Central under its contract,[118] that the Government, California, or Central, thought Central could accept and use any less than 80,000 acre-feet per year from New Melones.  There is also no evidence that, had the Government not announced its intention to breach the contract by delivering little or no water in most years, Central would not have gratefully accepted the full 80,000 acre-foot allocation.

---

[114] JA1300.

[115] JA310–JA311; JA164.

[116] JA1306–JA1310.

[117] JA101–JA128.

[118] JA1318–1320; JA1286.

There is even less evidence that Central would not have accepted the contractual minimum of 56,000 acre-feet of water annually. The Government's own Folsom South and New Melones studies demonstrated that there was a groundwater overdraft in the area and that Central needed 80,000 acre-feet per year to address that overdraft:

> A.    [T]hose studies indicated and supported our position that there was an overdraft in the area, and they indicated that our requirement was approximately 80,000 acre-feet of supplemental supply to address that overdraft.[119]

The Commissioner of Reclamation reported this to the Secretary of Interior:

> As part of the Folso[m] South Lower American River alternative study, the water requirements for the Folso[m] South unit were recently reanalyzed based on projected crop demand and cropping patterns, available groundwater supplies, canal losses and reuse of tailwater. The reanalysis reduced the total estimated supplemental canal site requirements. Central's from 90,000 acre-feet to 72,000 acre-feet and Stockton East's from 145,000 acre-feet to 98,000 acre-feet.[120]

Before signing the contract, Reclamation again adjusted its calculation of Central's water needs to 80,000 acre-feet—the figure appearing in the contract.[121] No one ever expressed any doubt that Central would use the allocated 80,000 acre-feet per year:

---

[119] JA1304.
[120] JA197.
[121] JA172.

41

Q. At any time during the negotiation of the contract, Plaintiffs' Exhibit 37, did anyone from the government indicate that they believed that Central was unable to take up to 80,000 acre-feet a year?

A. No.

Q. And the same question as to Central. At any time during the negotiations did anybody from Central draw the conclusion or express the opinion that Central couldn't take up to 80,000 acre-feet a year?

A. No.[122]

Characterizing Central's contract as a "firm commitment" for water delivery, Reclamation sought and received a modification of its California state water rights permit to allow the filling of New Melones reservoir—which the State Water Board had so far prohibited.[123] Relying on the testimony of Reclamation officials and representatives of Central and Stockton East, the California State Water Board issued an order amending Reclamation's permit to allow the filling of the reservoir to store water for delivery to Central and Stockton East:

29. [T]he Bureau has taken substantial steps toward executing contracts with . . . Central San Joaquin Water Conservation District for 80,000 acre-feet, and Stockton-East Water District for 75,000 acre-feet. . . . Negotiation of the contracts has been concluded and the draft contracts have been circulated for public comment and reviewed by the office of the Commissioner of Reclamation. The remaining steps are resubmission of the proposed contracts to the districts and execution of the contracts. The contracts with Stockton-East Water District and Central San Joaquin Water Conservation District are expected to be executed by May or June 1983.

* * *

---

[122] JA1305.

[123] *See California v. United States*, 438 U.S. 645 (1978).

42

31. Much evidence was presented during the hearing of an immediate need and market for interim water from the New Melones Project outside of the four-county area. Such water service could help alleviate water deficiencies and groundwater overdrafting in several parts of the San Joaquin Valley.

32. Based on the foregoing, we find that the permittee has established that it has firm commitments to deliver the full yield of New Melones water for consumptive uses. Furthermore, the evidence establishes that there is presently much more demand for New Melones water than the reservoir's yield.[124]

Later, as Central prepared in 1990 to accept New Melones water under the contract, Central needed to determine the type and location of internal distribution facilities it had to construct. This required that Central ascertain which of its farmers would use New Melones water, and how much they would use. So Central retained the international engineering firm CH2M Hill to determine the type and location of water delivery facilities Central needed to build to deliver water to its farmers, to design a construction plan for those facilities, to meet with Central's growers and speak with them regarding placing diversion structures, and to assist Central in its financing process.[125] CH2M Hill held several meetings with the farmers, surveyed their land, and obtained letters of intent signed by farmers stating their intention to use their portion of the 65,000 acre-feet of New Melones

---

[124] JA119–JA120.
[125] JA1305–JA1306.

water.[126]  CH2M Hill discounted this total by 20% to arrive at 50,000 acre-feet per year which, because of the 30% conveyance loss during transit from New Melones Dam, required over 70,000 acre-feet per year from the reservoir.[127]

On the basis of the farmers' letters of intent and CH2M Hill's demand analysis, Central's Board approved and adopted the CH2M Hill Report and "authorized the execution of bonds to build the project" totaling $7.4 million.[128] This was a huge commitment for a district whose annual income did not even equal the $500,000 debt service on those bonds.[129]

So to make sure that the farmer demand for surface water in the District was truly firm, Central's Board ordered General Counsel Roberts to conduct another survey of the farmers.  Roberts' survey again confirmed there was demand for at least 55,000 acre-feet (80,000 accounting for conveyance loss):

> Q.    Would you please describe to the Court what you did?
> A.    On March 1, 1991, a mailer was sent out to the comprised list that came from CH2M Hill as to what the responses to them had been from the District office with a —
> Q.    And the District office is your office?
> A.    Is 311 East Main.  Yes, my office, sent out from my office with an insert to be sent back to me addressed to me committing to take a quantity of water.
> Q.    Okay.  And did you receive responses to that mailer?
> A.    Yes, I did.
> Q.    And who tabulated them?

---

[126] JA772–JA803; JA1311.
[127] JA1311; JA1300.
[128] JA1312.
[129] JA1316.

> A.    I did a brief tabulation, got to the point of 55,000 acre-feet, and then I turned them over, after reviewing them with the board, turned them over to CH2M Hill.[130]

Throughout the construction process, even though Central had instituted a

per-acre tax and a groundwater extraction tax to finance the project,[131] the farmers

who would have used the New Melones water on their farms remained enthusiastic

about receiving the New Melones water:

> Q.    As of the time the constructions were let [sic] for this conveyance system, how would you characterize the reception of this project within you District?
> A.    It was very positive from virtually everybody we talked, or I talked to.[132]

The demand for surface water among Central's farmers remained high until

mid-1993, when Government officials announced there would be little or no water

forthcoming under Central's contract.  As Roberts testified:

> A.    [A]t the meeting, Frank Dimmick I believe his name is and Wayne White, Dimmick was there representing the Bureau, Mr. White was there representing Fish and Wildlife Service, spoke about what had transpired over the past year and basically said there was not going to be any water to honor the contracts it had to make.[133]

This was a game-changer.  Having just completed construction of the $7.4

million water delivery facilities, Central's Board was (if not outraged) greatly

discouraged:

---

[130] JA1313.
[131] JA1314–JA1315.
[132] JA1317.
[133] JA1319.

Q.    [I]t was a surprise and a shock.  When the CVPIA was passed, districts didn't really know exactly what it meant, and I attended an ACWA, Association of California Water Agencies, meeting in the fall of '92 where the prime subject was the CVPIA, and there were officials there who basically indicated that it would not have that great of an effect at least upon the contracts of Stockton East and Central, but at this meeting in the summer of '93, just the opposite was stated.

Q.    Okay.  What as your reaction to what you heard at that meeting?

A.    Extremely disappointed and discouraged.

Q.    How would you characterize the reaction of Central's leadership when they heard about it?

A.    Very much the same.  I'm not going to use the word outraged, but it was extreme disappointment and discouragement and very great concern that they had indebted the District to finance and build the project and the possible outcome was going to be that no water was going to be delivered.[134]

Jeanne Zolezzi, General Counsel to Stockton East, also described the

meeting and its aftermath, corroborating Roberts' account:

In October of 1992, Congress passed the Central Valley Project Improvement Act.  In the spring of that year, in March, I believe, the Fish & Wildlife Service developed their first what they called prescription, which was a determination of how much water they were taking from CVP contractors.  The initial prescription took over 200,000 acre-feet from New Melones Reservoir, which was more than the two contracts on that reservoir.

We requested a meeting as a result with the Bureau of Reclamation and Fish & Wildlife Service in Stockton, California, to discuss that prescription and how the CVPIA would affect our contracts.  At that meeting, we were told by both Fish & Wildlife Service and the Bureau of Reclamation that the 250,000 acre-feet of water that they had reallocated from contractors to fish is what they

---

[134] JA1320.

46

had determined on the back of an envelope would be needed for fish, that they believed it would be needed in every year.

They actually didn't realize that there were contractors on the New Melones project, and once they discovered that we had a contract, they indicated very strongly that we would probably not be getting the water supply as a result of CDPIA. We scrambled after that. Obviously, we were just completing a $65 million facility to bring water from the Stanislaus River, and we're told that we would get no water that year, and it would probably be unlikely that we would get water in the future, so we started digging to see who else might have water that we could bring to our area.[135]

There is no evidence that Central's farmers would not have taken the full allocation of surface water, making the investment (with the help of the capital improvement program), but for the Government's announcement there would be little or no New Melones water under the contract. Nothing else had changed, and no reason the farmers would not have taken their contractual entitlement to surface water in the but-for world where the Government performed as promised. General Counsel Roberts confirmed this in his testimony:

Q.    Okay. Had it not been for the events relating to the CVPIA and the allocations of water and the breach by Reclamation in 1999, in your opinion, how much water would Central have requested?
A.    I believe we would have requested a full allocation on the basis that all of our information was we would be able to take, sell and utilize at least 50,000 acre-feet for on-farm delivery.
Q.    Okay.
A.    And so that corresponds into basically a full allocation request.
Q.    Okay. And by full allocation, how much is that?

[135] JA1286–JA1287.

47

> A.    Well, that's 80,000 acre-feet.
>
> Q.    Okay.  And I'll ask you the same question as to the year 2000.  Had the events that you have described no occurred, how much would Central have requested in the year 2000?
>
> A.    We would have requested the 80,000 acre-feet allocation.
>
> Q.    And as to the year 20[0]1?
>
> A.    The same, 80,000 acre-feet.
>
> Q.    And how about the remaining years.
>
> A.    The same.[136]

## D.    Central would have sold any excess water

Central would have taken its full allocation in each of the breach years for

yet another reason:  Central had the legal right, with Reclamation's authorization,

to sell excess water it was entitled to under the contract.[137]  So any water that

Central's farmers did not take would have been sold (at a profit) on the active

water market existing in the San Joaquin basin.[138]

Reclamation in 1993 adopted a written policy to facilitate such transfers to

provide for "more effective and efficient use of water within the Central Valley

Project," and "to maximize the flexibility for the contractor."[139]  The guidelines

were issued under Section 3405(a) of the Central Valley Project Improvement Act:

> [The CVPIA] authorizes all individuals or districts who receive Project water under water service or repayment contracts, water rights settlement contracts or exchange contracts to transfer, subject to certain conditions, all or a portion of the water subject to such contracts to any California water user or agency, State or Federal

---

[136] JA1321JA1322
[137] JA183; JA202–JA210.
[138] JA1331; JA1323.
[139] JA202–JA210.

agency, Indian Tribe or private non-profit organization for Project purposes or any purpose recognized as beneficial under State law.[140]

Reclamation's Transfer Guidelines state that such water transfers have historically been allowed: "The authority provided in Section 3405(a) for transfers of Project water is supplemental and in addition to Reclamation's existing authority to allow annual transfers between Project water users, which have historically been allowed and which are encouraged under existing contracts for efficient and effective Project water management."[141]

Confirming Reclamation's historic practice of approving such water transfers, Angela Slaughter, the Chief of Reclamation's Water Policy and Contracts Branch, testified that Reclamation approves all but about 2% of the contractor requests for transfer of water received each year.[142]  Even Reclamation itself produced a list of the transfers it had approved during the breach years.[143]

The trial court correctly concluded that Central could have sold any excess water it may have received from Reclamation:

> Central's evidence establishes that it would have been possible for Central to make sales of water. While the 1983 Contract places certain limits on water transfers and conditions them on Reclamation approval, see PX 37, at 00398; PX 602, at 3–6, Ms. Slaughter's testimony revealed that, in practice, Reclamation disapproved very few transfer requests, see Tr. 1705–08 (Slaughter). Ms. Slaughter did

---

[140] JA202.

[141] JA202.

[142] JA1324–JA1328.

[143] JA257–JA301.

advert to potential "compliance issues" that might have affected Central's ability to transfer water, see Tr. 1732–34 (Slaughter), but defendant withdrew the questions regarding that subject, see Tr. 1738 (Snyder), and that testimony consequently does not factor into the court's finding that it was possible for Central to make transfers of water.[144]

## III.    The trial court anticipated this appeal and therefore made factual findings that permit this Court to determine Central's damages

Anticipating this appeal, "and in an abundance of caution,"[145] the trial court provided this Court the factual findings required to calculate Central's damages without retrial.  The trial court found that "if Central had proved that it was damaged by Reclamation's breach, the proper spot-market price to use in any damages calculation would be that advanced by Dr. Smith."[146]  The trial court explained:

> Dr. Smith examined eighteen one-year water transactions involving water rights originating on the San Joaquin River or its tributaries during the breach period, as well as three from 1998 because no such transactions occurred in 1999. Using those data, Dr. Smith opined that the spot-market value of water was $60 per acre-foot in 1999, $80 in 2000, $90 in 2001, $135 in 2002, $85 in 2003, and $120 in 2004.[147]

The trial court noted that "Defendant's expert witness Dr. Sunding agreed with Dr. Smith's methodology, but disagreed with the latter's decision to exclude

---

[144] JA28.
[145] JA29.
[146] JA30.
[147] JA29.

the SSJID transactions," but that "[t]he court finds that Dr. Smith's exclusion of the SSJID transactions was proper."[148]

"The court also heard testimony as to the market price of water from Mr. O'Laughlin and Stockton East's expert witness, Clay J. Landry [both of whom testified to market values higher than Dr. Smith's]. Neither witness's testimony is entitled to as much weight as that of Dr. Smith."[149]

Using the per-acre-foot values found proper by the trial court for each of the breach years, this Court can readily determine the expectation damages due Central:

| Year | Spot market price of water per acre-foot | Amount Central would have paid Reclamation per acre-foot | Difference between market price and Reclamation's price per acre-foot | Quantity of water not delivered (in acre-feet) | Damages |
|---|---|---|---|---|---|
| 1999 | $60 | $9.24 | $50.76 | 22,214 | $1,127,582.64 |
| 2000 | $80 | $10.44 | $69.56 | 28,241 | $1,964,443.96 |
| 2001 | $90 | $11.14 | $78.86 | 30,250 | $2,385,515.00 |
| 2002 | $135 | $10.53 | $124.47 | 15,497* 10,000** | $1,928,911.59 $44,700.00 |
| 2003 | $85 | $11.85 | $73.15 | 31,155* | $2,278,988.25 |
| 2004 | $120 | $13.67 | $106.33 | 32,395* | $3,444,560.35 |
| Total | | | | | **$13,174,701.79** |

\* These quantities have been reduced to account for the quantities of water Central purchased from SSJID, for which Central received cost-of-cover damages.

\*\* In 2002 Central could have purchased an additional 10,000 acre-feet from SSJID, for which the damages are $4.47 per acre-foot or a total of $44,700.

---

[148] JA30

[149] JA30.

51

Central is also entitled to the $149,950 in cover damages awarded by the trial court.[150]

Finally, although the trial court raised the specter of wheeling charges as avoided costs, Central would not have been liable for any such charges, as the California courts affirmed in dismissing a suit brought to recover them.[151]  So the expectancy damages calculated here are the correct amount to be awarded to central in this case.

**Conclusion**

For all these reasons, this Court should reverse the judgment of the trial court and order that judgment be entered in favor of Central for $13,324,651.79.

Respectfully submitted,

/s/ Roger J. Marzulla
Roger J. Marzulla
Nancie G. Marzulla
Marzulla Law, LLC
1150 Connecticut Avenue, NW
Suite 1050
Washington, DC 20036
(202) 822-6760 (telephone)
(202) 822-6774 (facsimile)
Roger@marzulla.com
Nancie@marzulla.com

July 10, 2013                              Counsel for Central San Joaquin
                                           Water Conservation District

---

[150] JA19.
[151] JA742–JA766

# ADDENDUM

# In the United States Court of Federal Claims

No. 04-541 L

**STOCKTON EAST WATER DISTRICT
AND CENTRAL SAN JOAQUIN WATER
CONSERVATION DISTRICT,**

                                          **JUDGMENT**

    v.

**THE UNITED STATES**


       Pursuant to the court's February 28, 2013 Memorandum Opinion and Order on Claims of Stockton East Water District,

       IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff, Central San Joaquin Water Conservation District, recover of and from the United States the sum of $149,950.00.  No costs.


                                    Hazel C. Keahey
                                    Clerk of Court

**February 28, 2013**         By:    s/Lisa L. Reyes

                                    Deputy Clerk


NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs.  Filing fee is $455.00.

109 Fed.Cl. 460
United States Court of Federal Claims.

STOCKTON EAST WATER DISTRICT and Central
San Joaquin Water Conservation District, Plaintiffs,
v.
The UNITED STATES, Defendant.

No. 04–541L    |    Filed February 28, 2013

**Synopsis**

**Background:** California water districts sued United States,
asserting breach of contract claim and takings claim based on
Bureau of Reclamation's alleged failure to provide districts
with specified volumes of water from reservoir, pursuant
to water supply contracts. After bench trial, the Court of
Federal Claims, Christine O.C. Miller, J., 75 Fed.Cl. 321,
awarded judgment for United States on breach of contract
claim and dismissed takings claim, 76 Fed.Cl. 470, granted
in part and denied in part districts' motion to alter or amend
judgment, and 76 Fed.Cl. 497, denied districts' motion for
reconsideration. Districts appealed. The United States Court
of Appeals for the Federal Circuit, Plager, Circuit Judge, 583
F.3d 1344, affirmed in part, reversed in part, vacated in part,
and remanded for determination of damages for breaches of
contracts.

**Holdings:** The Court of Federal Claims, Miller, J., held that:

[1] district was entitled to award of cost of cover mitigation
damages, but

[2] district was not entitled to award of expectancy damages.

Ordered accordingly.

**Attorneys and Law Firms**

Jennifer L. Spaletta , Stockton, CA, for plaintiff Stockton East
Water District. Jeanne M. Zolezzi and Alexis K. Galbraith ,
Herum Crabtree, Stockton, CA, of counsel. Roger J. Marzulla
, Washington, DC, for plaintiff Central San Joaquin Water
Conservation District. Nancie G. Marzulla , Marzulla &
Marzulla, Washington, DC, of counsel.

David A. Harrington , Barbara E. Thomas, Sharon A.
Snyder, Washington, DC, and Terry M. Petrie , Denver,
CO, with whom was Principal Deputy Assistant Attorney
General Stuart F. Delery , for defendant. Amy Aufdemberge,
Assistant Regional Solicitor, U.S. Department of the Interior,
Sacramento, CA, and Shelly V. Randel , Office of the
Solicitor, Washington, DC, of counsel.

**Opinion**

MILLER, Judge.

> **Contract damages; expectation damages;
> cost of cover; reasonableness of mitigation;
> foreseeability; causation of damages.**

### MEMORANDUM OPINION AND ORDER
### ON CLAIMS OF CENTRAL SAN JOAQUIN
### WATER CONSERVATION DISTRICT

This case, before the court on remand from the United
States Court of Appeals for the Federal Circuit, involves
a dispute over two water supply contracts. Plaintiffs
Stockton East Water District ("Stockton East") and Central
San Joaquin Water Conservation District ("Central")
(collectively, "plaintiffs" or the "districts") are water agencies
organized under the laws of California with the authority to
provide water to municipal, industrial, or agricultural users
within California's San Joaquin Valley. In 1983 plaintiffs
entered into separate contracts (the "1983 Contracts" or the
"Contracts") with the United States Bureau of Reclamation
("Reclamation") for the appropriation of water from the New
Melones Reservoir. Reclamation breached the Contracts in
the years 1999 to 2004 when it failed to provide specified
volumes of water to plaintiffs. *Stockton E. Water Dist.
v. United States,* 583 F.3d 1344, 1356–69 (Fed.Cir.2009)
("*Stockton III*"), *reh'g en banc granted in part,*638 F.3d 781
(Fed.Cir.2011), *aff'g in part, rev'g in part, and remanding,
Stockton E. Water Dist. v. United States,* 75 Fed.Cl. 321
(Fed.Cl.2007) ( "*Stockton I* "), *modified,* 76 Fed.Cl. 470
(2007) ("*Stockton II* "). The Federal Circuit remanded the
case to this court for a determination of damages for the
breaches that occurred from 1999 through 2004. *Id.* at 1369.
The Federal Circuit also vacated this court's dismissal of
plaintiffs' takings claim and tasked this court with deciding
plaintiffs' takings claim on remand. *Id.*

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.     1

**\*465**  In October 2011, following briefing by the parties, this court granted defendant's motion to dismiss plaintiffs' takings claim. *Stockton E. Water Dist. v. United States,* 101 Fed.Cl. 352, 362 (2011) ("*Stockton IV* "). The parties proceeded with discovery regarding contract damages, and this court held an eight-day damages trial during September 2012. On remand the parties adopted the convention of filing separate briefs. Because both plaintiffs presented distinct proofs and proceeded separately at trial, the court has issued separate opinions regarding the contract damages for Stockton East and Central. The "Discussion" section of this opinion concerns only the contract damages of Central. However, the "Facts" section of the separate opinions makes findings with respect to both districts because the proofs addressed joint issues or otherwise overlapped.

Plaintiff Central seeks: (1) damages of $194,650.00 to account for its costs of mitigation and (2) expectation damages of between $10,654,417.00 and $15,326,360.00.

## FACTS [1]

[1]    The facts set forth in the "Facts" and "Discussion" sections of this opinion constitute the court's findings of fact pursuant to RCFC 52(a)(1). The legal standards governing claims for contract damages sought by plaintiffs frame the context in which relevant facts are found, so the particular findings appear in the "Discussion" section. Rulings on mixed questions of fact and law also are set forth in the "Discussion" section.

The factual background and circumstances underlying the 1983 Contract were recited in the Federal Circuit's 2009 opinion in *Stockton III,* 583 F.3d 1344, and this court's 2007 opinion on liability, *Stockton I,* 75 Fed.Cl. 321. Accordingly, this opinion discusses only those facts necessary to resolve the damages issues that were tried.

### I. *The Central Valley Project and New Melones Unit*
The Central Valley Project (the "CVP")—the largest federal water management project in the United States—is situated entirely in California and is operated by the United States through Reclamation. *Stockton III,* 583 F.3d at 1349. The CVP was built to serve the water needs of California's Central Valley Basin and contains numerous dams, reservoirs, power plants, canals, and other facilities. *Id.* Completed in 1979, the New Melones Unit of the CVP consists of a large concrete

dam on the Stanislaus River and a reservoir with a storage capacity of 2.4 million acre-feet of water.[2] *Id.*

[2]    An acre-foot is the volume of water necessary to cover one acre of land with water to a depth of one foot.

The Flood Control Act of 1962, which modified the authorization of the New Melones project, required Reclamation to "determine the quantity of water required to satisfy all existing and anticipated future needs within [the Stanislaus River] [B]asin." Pub.L. No. 87–874, 76 Stat. 1173, 1191; *see also Stockton III,* 583 F.3d at 1350. In a 1980 Special Report, Reclamation estimated that 180,000 acre-feet of water would be available annually for agricultural, municipal, and industrial uses. *Stockton III,* 583 F.3d at 1350. Relying upon the 1980 Special Report, Reclamation issued a Record of Decision in 1981, which recommended that Reclamation allocate a portion of the New Melones water supply to Stockton East and Central. PX 15, at 00336; *see also Stockton I,* 75 Fed.Cl. at 337.

### II. *The 1983 Contracts*
The damages trial provided a forum for explicating several provisions of the 1983 Contracts.[3] Accordingly, the court summarizes the provisions relevant for determining contract damages, citing prior undisturbed or affirmed rulings from this court's 2007 liability opinion and the Federal Circuit's 2009 opinion as necessary.

[3]    The term "Contract" refers to the respective 1983 Contracts of either Stockton East or Central.

#### 1. *Purposes of the Contracts*
In the early 1980s, Reclamation began contract negotiations to sell New Melones water to Stockton East and Central. **\*466** *Stockton III,* 583 F.3d at 1350. On December 19, 1983, Stockton East and Central signed nearly identical contracts with Reclamation for delivery of water from the New Melones Reservoir. PX 36;[4] PX 37. Both contracts recite that "[Reclamation] is constructing and operating the Central Valley Project, California for the purpose, among others, of furnishing water for irrigation, municipal, industrial, domestic, and other beneficial uses[.]" PX 36, at 00352; PX 37, at 00382. The Contracts also state, "[I]nvestigations by [Reclamation] indicate that [each district] has a present and potential need for an irrigation and a municipal and industrial water supply[,]" and "[each district] has sought a long-term water supply from the Folsom South Canal of the

Central Valley Project which is not currently available[.]" PX 36, at 00353; PX 37, at 00383. Stockton East and Central both entered into their respective contracts due to depleted groundwater and the need for surface water as both an alternative source and as a means of avoiding further depletion of groundwater. Joint Stipulation of Fact, filed Aug. 31, 2012, ¶ 2 ("Jt. Stipl.").

4    Both Stockton East and Central denoted their exhibits as "PX." Exhibits introduced by Central that are cited in this opinion are numbered beginning with 600, with the exception of PX 37.

**2. *Reclamation's obligation to provide minimum quantities of water***

Article 3 of the Contracts sets forth the formula by which Reclamation was to make water available to Stockton East and Central. *SeeStockton III,* 583 F.3d at 1351–52; *Stockton I,* 75 Fed.Cl. at 364–66. Article 3(c) of Stockton East's Contract provides that "[Reclamation] shall make available and [Stockton East] shall pay for, as a minimum, such quantities of agricultural water as specified[.]" PX 36, at 00357; *seeStockton I,* 75 Fed.Cl. at 365. Central's contract contains an identical provision. PX 37, at 00388; *see Stockton I,* 75 Fed.Cl. at 365. Subsection (c)(1) states that for the first five years of contract performance, beginning with the first full year after Reclamation notified the districts that water was available for delivery, Reclamation was to make

available the amount of agricultural water that the districts requested. PX 36, at 00357; PX 37, at 00388. For years six through ten, Subsection (c)(2) specifies a minimum volume of agricultural water that increases from years eight to nine. PX 36, at 00357–58; PX 37, at 00389. If the districts requested more water than the annual minimum during this period, however, the requested amount became the new minimum for each subsequent year until exceeded by other contractual minimums. PX 36, at 00357–58; PX 37, at 00389. The amount of water scheduled in the eleventh year would be the minimum amount for each remaining year of the Contract. PX 36, at 00358; PX 37, at 00389.

Article 3(d) of Stockton East's contract provides that "[Reclamation] shall make available and [Stockton East] shall pay for, as a minimum, such quantities of M & I [municipal and industrial] water as specified" and includes a table listing minimum quantities of M & I water for each year of contract performance. PX 36, at 00358–59. Subsection (d) of both contracts allows the districts to convert the agricultural water specified in Subsection (c) to M & I use. PX 36, at 00358, 00360; PX 37, at 00389. These provisions, taken together, provide the following Build–Up Schedule of annual minimum quantities of water (in acre-feet) that Reclamation was obligated to make available from 1993 through 2004:

**\*467**

WestlawNext® © 2013 Thomson Reuters. No claim to original U.S. Government Works.    3

| Year | Stockton East Build-Up | Central Build-Up |
|---|---|---|
| 1993 | 500 | 0 |
| 1994 | 23,350 | 28,000 |
| 1995 | 23,450 | 28,000 |
| 1996 | 25,550 | 28,000 |
| 1997 | 46,400 | 56,000 |
| 1998 | 46,500 | 56,000 |
| 1999 | 47,200 | 56,000 |
| 2000 | 47,900 | 56,000 |
| 2001 | 48,600 | 56,000 |
| 2002 | 49,300 | 56,000 |
| 2003 | 50,000 | 56,000 |
| 2004 | 50,700 | 56,000 |

*See* Jt. Stipl. ¶ 7; *Stockton II,* 76 Fed.Cl. at 489; *see also Stockton III,* 583 F.3d at 1351–52.[5] Article 3 of both Contracts also specifies a maximum amount of water that Reclamation would make available annually. PX 36, at 00356–60; PX 37, at 00387–90; *see also Stockton III,* 583 F.3d at 1350–51.

[5] Shortly after this court issued its February 20, 2007 liability opinion, plaintiffs filed a Motion to Amend or Modify Decision. *See Stockton II,* 76 Fed.Cl. at 471–72. In response to defendant's assertion that the court miscalculated the minimum volumes of water with respect to Stockton East for the years 1999 through 2004, the court amended its February 2007 opinion to correct the computation for those years. *Compare Stockton I,* 75 Fed.Cl. at 365, *with Stockton II,* 76 Fed.Cl. at 479–80, 489. The Federal Circuit's opinion, however, noted a Build–Up Schedule that was almost identical to the one appearing in the trial court's original opinion and therefore included incorrect minimum volumes for the six breach years. *Compare Stockton III,* 583 F.3d at 1352, *with Stockton II,* 76 Fed.Cl. at 489. Prior to the damages trial, the parties stipulated to the quantities specified in Stockton East's Build–Up Schedule for the years 1999 through 2004. Jt. Stipl. ¶ 7. The stipulated quantities for those years differed from the quantities listed in this court's amended liability opinion. *Compare* Jt. Stipl. ¶ 7, *with Stockton II,* 76 Fed.Cl. at 489. Consequently, and representing a final consensus, the Build–Up Schedule listed above includes the stipulated quantities for the years 1999 through 2004.

This court found that Reclamation's failure to provide the minimum quantities of water listed in the Build–Up Schedule violated the requirements of Article 3, but held that Reclamation would not be liable for breach if it had a valid excuse under the Contracts for its non-performance. *Stockton II,* 76 Fed.Cl. at 489; *Stockton I,* 75 Fed.Cl. at 365–66. The Federal Circuit affirmed this court's finding that, absent a valid excuse, Reclamation would be liable for breach of contract for its failure to deliver the minimum quantities of water listed in the Build–Up Schedule. *Stockton III,* 583 F.3d at 1356–57 ("The record establishes and the trial court found as a fact that Reclamation failed to provide the water that was promised under the 1983 contracts for the years 1994, 1995, and 1999–2004.... Absent an affirmative defense, that failure by the Government would constitute a breach of the contracts and render the Government liable for damages for the breach."). Reclamation's nonperformance in the years 1999 through 2004 was not excused, and therefore

JA5

Reclamation was liable for breaching the Contracts in those years. *Id.* at 1364–65.

### 3. *"Take or pay" provision*

This court previously found that Article 3 not only obligated Reclamation to provide the **\*468** minimum amounts of water listed in the Build–Up Schedule, but also required each district to purchase such amounts of water. *Stockton I,* 75 Fed.Cl. at 365 (referring to the Build–Up Schedule as a "minimum purchase and supply schedule"). The Federal Circuit affirmed that finding. *Stockton III,* 583 F.3d at 1351 ("Article 3 also establishes for each year of the contract a *minimum* amount of water that Reclamation is obligated to make available, and for which the Districts must pay[.]").

At the damages trial, Reid W. Roberts, Central's General Counsel, testified as to his understanding that Article 3 contained a provision requiring Central to purchase the minimum quantities of water. Transcript of Proceedings, *Stockton E. Water Dist. v. United States,* No. 04–541L (Fed.Cl. Sept. 10–19, 2012) ("Tr."), at 1643–44 (Roberts).[6] Mr. Roberts also testified, however, that Reclamation had a practice of requiring Central to pay for only the volume of water that actually was delivered during both the breach and non-breach years:

> Q. The practice in the 1999 to 2004 period was for Central to only pay for water actually delivered from the Bureau of Reclamation, correct?
>
> A. That's correct[.]
>
> ....
>
> Q. So both before and after the period 1999 to 2004, the practice between Central and the Bureau of Reclamation was to pay for the volume of water actually delivered under the New Melones contract.
>
> A. That was the practice that we engaged in. Yes.

Tr. 1821, 1827 (Roberts). The evidence adduced at the damages trial therefore shows that Reclamation did not enforce the "take or pay" provision with respect to Central. Although no witnesses provided similar testimony regarding Reclamation's enforcement of the "take or pay" provision with respect to Stockton East, the latter impliedly concedes in its post-trial brief that it paid only for the volumes of water Reclamation actually delivered. *See* Pl. Stockton East's Br. filed Nov. 9, 2012, at 8 (citing records depicting actual deliveries under the Contract—PX 411 and PX 434—as

evidence of the volumes that Stockton East purchased under its Contract).

6    Parentheses attribute statements by counsel and witnesses. Statements by counsel do not constitute testimony or evidence, although they may prove useful for setting forth litigating positions and for explaining uncontested terms.

### 4. *The Article 9(a) shortage provision*

Although Article 3 of the 1983 Contracts requires Reclamation to make minimum quantities of water available to the districts annually, the Contracts also provided for certain exceptions. One such exception, the shortage provision of Article 9(a), states that the United States shall not be liable "if a shortage does occur in any year because of drought, or other causes which ... are beyond the control of the United States." PX 36, at 00368; PX 37, at 00398; *see alsoStockton III,* 583 F.3d at 1352, 1361–62. This court found that Reclamation's failure to provide the minimum amounts of water specified in the Build–Up Schedule for the years 1994 and 1995 was excused due to the shortage provision of Article 9. *Stockton I,* 75 Fed.Cl. at 364. The Federal Circuit affirmed this court's holdings with respect to the years 1994 and 1995, *Stockton III,* 583 F.3d at 1363–64, 1369, explaining that Article 9 is a *force majeure* provision that applies to causes "beyond the control of the United States," such as a drought, earthquakes, an internal failure of the dam, or other such causes, *id.* at 1361–62. Citing the liability trial testimony of Edward M. Steffani, Stockton East's former General Manager, and Central's General Counsel Mr. Roberts, the Federal Circuit further explained that when the parties executed the 1983 Contracts, both districts understood that Article 9(a) provided for shortages caused by external circumstances, including dry years, physical problems with the reservoir, or earthquakes. *Id.* at 1362.

### 5. *The districts' obligation to submit annual schedules to Reclamation*

Article 4(a) of the 1983 Contracts requires the districts to submit annual schedules to Reclamation "indicating the amounts of agricultural and M & I water required monthly." **\*469** PX 36, at 00361; PX 37, at 00391; *see alsoStockton III,* 583 F.3d at 1352; *Stockton I,* 75 Fed.Cl. at 362. Stockton East submitted valid schedules pursuant to the requirements of Article 4(a) from 1994–1996 and in 1998, and Central submitted a valid schedule in 1995. *Stockton*

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.     5

*I,* 75 Fed.Cl. at 362. This court held, however, that the districts' failure to submit valid schedules in other years did not excuse Reclamation's failure to provide the minimum amount of water listed in the Build–Up Schedule. *Stockton I,* 75 Fed.Cl. at 363, 365–66. The failure to provide valid schedules did not excuse Reclamation's non-performance because the districts' payment for water and construction of conveyance facilities pursuant to the 1983 Contracts constituted substantial performance.[7] *Id.* The Federal Circuit affirmed, and the parties did not further dispute, this court's ruling that the districts' failure to submit schedules did not excuse any breach of contract by Reclamation. *See Stockton III,* 583 F.3d at 1352.

[7]    The districts' construction of water conveyance facilities is discussed in greater detail later in this section of the opinion.

### 6. *Central's so-called "priority right" to Stockton East's water*

Article 9(b) of Stockton East's Contract states: "During such water short years, the quantity of water available to [Stockton East] pursuant to the terms of this contract shall be reduced, as necessary, to meet the full needs of the Basin contractors and the needs of Central San Joaquin Water Conservation District for its firm and interim water supply."[8] PX 36, at 00368. Defendant asserts that this language granted Central a "priority right" as a third-party beneficiary to Stockton East's Contract and therefore entitled Central take all available New Melones water during the six-year breach period. *See* Def.'s Br. filed Dec. 21, 2012[366], at 11; *see also* Transcript of Proceedings, *Stockton E. Water Dist. v. United States,* No. 04–541L (Fed.Cl. Jan. 4, 2013) ("Closing Arg. Tr."), at 156–58 (Harrington). Defendant cites two separate contracts between the districts (the "forbearance agreements") signed in 1995 and 1996, *see* DX 847 and DX 864, as evidence of the "priority right" granted to Central in Article 9(b) of Stockton East's Contract. Closing Arg. Tr. at 157 (Harrington). The "whereas" clauses of the forbearance agreements both state: "Stockton–East is entitled to water under its contract [with Reclamation] only after Central has received or forgone the water to which it is entitled[.]" DX 847, at SE17892; DX 864, at CSJW_ 005386. Defendant also points to the deposition testimony of Mr. Roberts and Grant O. Thompson, Chairman of Central's Board of Directors, that Central had the option to take the first 80,000 acre-feet of water that Reclamation allocated. DX 1184 (Deposition of Reid W. Roberts, May 3, 2012), at 64; DX 1185 (Deposition of Grant O. Thompson, May 22, 2012), at 98–99. Central responds that no such

"priority right" existed under the 1983 Contracts and that Messrs. Roberts and Thompson "appear to have mistakenly believed" that such a priority right existed. Pl. Central's Br. filed Dec. 10, 2012, at 13.

[8]    Article 9(b) of Central's Contract includes a similar provision, although it does not specifically name Stockton East. *See* PX 37, at 00398 ("During such water short years, the quantity of water available for [Central's] firm and interim water supply pursuant to the terms of this contract shall be reduced, as necessary, to meet the full needs of the Basin contractors.").

Although the forbearance agreements and deposition testimony of Messrs. Roberts and Thompson manifest the districts' understanding that Central had the option to request the first 80,000 acre-feet of New Melones water, the evidence does not probatively demonstrate that a priority right was, in fact, granted to Central under Article 9(b) of Stockton East's Contract. Indeed, the language of Article 9(b) in Central's Contract shows that Central did not have such a priority right because the "quantity of water available for [Central]" in water short years "shall be reduced, as necessary, to meet the full needs of the Basin contractors." PX 37, at 00398. Rather than granting a right to Central, Article 9(b) in Stockton East's contract may operate as a defense for Reclamation in the event that Reclamation determined it was "necessary" to reduce Stockton East's **\*470** allocation to meet the full needs of Central in a "water short" year. *See* PX 36, at 00368.

### 7. *Transfers of New Melones water*

The 1983 Contracts also limit the ability of each district to sell water outside of its respective service area. Article 10 of the Contracts—entitled "Transfers or Exchanges of Water"—provides that "[w]ater furnished to the Contractor pursuant to this contract shall not be sold, exchanged, or otherwise disposed of for use outside the Contractor's service area without prior written consent from the Contracting Officer." PX 36, at 00368; PX 37, at 00398.

In 1993 Reclamation adopted Interim Guidelines (the "Water Transfer Guidelines") for implementation of the water transfer provisions of § 3405(a) of the Central Valley Project Improvement Act (the "CVPIA"). *See* PX 602. The Water Transfer Guidelines acknowledge that § 3405(a) of the CVPIA authorizes transfers of New Melones water:

Section 3405(a) authorizes all individuals or districts who receive [CVP] water under water service or repayment contracts ... to transfer, subject to certain conditions, all

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.    6

or a portion of the water subject to such contracts to any California water user or agency, State or Federal agency, Indian Tribe or private non-profit organization for [CVP] purposes or any purpose recognized as beneficial under State law.

*Id.* at 1. The Water Transfer Guidelines further explain that § 3405(a) is supplemental to "Reclamation's existing authority to allow annual transfers between Project water users, which have historically been allowed and which are encouraged under existing contracts for efficient and effective Project water management." *Id.* Section 1 of the Water Transfer Guidelines outlines the Guidelines' three objectives: "to address all water transfers equitably, to provide for a more efficient and effective use of the water supply developed by the [CVP], and to provide greater flexibility to water users in transferring water developed by the [CVP][.]" *Id.* Angela K. Slaughter, Chief of the Water Contracts and Policy Branch for Reclamation, Sacramento, CA, testified that Reclamation has used the Water Transfer Guidelines since 1993 in determining whether CVP contractors are permitted to transfer New Melones water. Tr. 1709, 1718–19 (Slaughter).

Section 5 of the Water Transfer Guidelines specifies the criteria for transfers authorized under § 3405(a). PX 602, at 3–6. Criterion H, for example, states that "[a]ll transfers will be limited to [CVP] water that would have been consumptively used or irretrievably lost to beneficial use during the year or years of the transfer." *Id.* at 4. Ms. Slaughter testified that Criterion H requires a transferor to show that the water previously had been used within the transferor's district and would be used in the transferor's district but for the transfer. [9] Tr. 1721–24 (Slaughter). In addition, Criteria L and M require a transferor to comply with federal and state law, including the National Environmental Policy Act, the Endangered Species Act, the Fish & Wildlife Service Coordination Act, the California Environmental Quality Act ("CEQA"), and the California Endangered Species Act. PX 602, at 4–5; Tr. 1724–25 (Slaughter).

[9]    Ms. Slaughter clarified that Criterion H is "subject to [Criterion] J," Tr. 1724 (Slaughter), which means that "[t]ransfers between [CVP] contractors within counties, watersheds or other areas of origin" satisfy the requirements of Crietrion H. PX 602, at 4.

## 8. *Construction of water conveyance facilities*

Article 7(b) of the 1983 Contracts requires the districts to "construct and install, without cost or expense to the United

States, facilities required by [the districts] to take and convey the water from the point or points of delivery." PX 36, at 00364; PX 37, at 00394; *see also Stockton III,* 583 F.3d at 1351; *Stockton I,* 75 Fed.Cl. at 363.

Kevin M. Kauffman, Stockton East's General Manager since June 1993, testified at the damages trial that Stockton East completed construction of the New Melones Conveyance System (the "NMCS") in 1993 at a cost of $65 million. [10] Tr. 70, 95 (Kauffman). Stockton **\*471** East financed construction of the NMCS with a bond offering. Tr. 98 (Kauffman). The NMCS conveys New Melones water from the Goodwin Dam to Stockton East via the Goodwin Tunnel, Upper Farmington Canal, a natural creek system, and the Lower Farmington Canal. *See* Tr. 90–91 (Kauffman) (discussing PX 518). The water enters Stockton East through the Lower Farmington Canal at the Copperopolis Gates. Tr. 464 (Kauffman) (discussing PX 518).

[10]    The court's 2007 liability opinion found that the cost of the NMCS was approximately $60 million, according to the testimony of Stockton East's former General Manager from 1983–1999 Edward M. Steffani. *See Stockton I,* 75 Fed.Cl. at 363 n.17 (citing Transcript of Proceedings, *Stockton E. Water Dist. v. United States,* No. 04–541L (Fed.Cl. Oct. 30, 2006) ("Liab. Trial Tr."), Tr. 415). As is evident from the varying water delivery schedules in the different stages of this litigation, the parties have refined the evidence and, unless a significant point is invalid, the court accepts the most recent iteration.

Although Central did not fund construction of the NMCS described above, *see Stockton I,* 75 Fed.Cl. at 363 n.17, Central financed construction of a separate distribution system with bonds at a total cost of $7.4 million. Tr. 1623, 1626 (Roberts) (latter discussing PX 812). Central's distribution system "tie[d] ... together" a series of natural streambeds and channels within Central's boundaries. Tr. 1605–06 (Roberts) (discussing PX 518). Central receives New Melones water from Reclamation at the Goodwin Dam, at which Stockton East "wheels" the water through its conveyance system to Central's boundary on the western side of the Farmington dam. *See* Tr. 634–35 (Kauffman); Tr. 1692 (Roberts). Central's water then flows through the Farmington Dam and into its distribution system of natural streambeds and creeks. Tr. 1605–06 (Roberts).

## 9. *Water rates under the Contracts*

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

The parties stipulated to the water rates under the 1983 Contracts for the six-year breach period. Jt. Stipl. ¶¶ 3–5. From 1999 through 2004, Stockton East and Central were required to pay the following rates, per acre-foot, for water purchased from Reclamation under the 1983 Contracts:

| Year | Stockton East's Water Rate | | Central's Water Rate (Ag Water) |
|------|---------------|-------------|-----------------|
|      | Ag Water | M&I Water |  |
| 1999 | $9.24 | $46.75 (Jan. - Sept.) | $9.24 |
|      |       | $46.99 (Oct. - Dec.) |  |
| 2000 | $10.44 | $43.80 (Jan. - Sept.) $44.16 (Oct. - Dec.) | $10.44 |
| 2001 | $11.14 | $43.04 (Jan. - Sept.) $43.56 (Oct. - Dec.) | $11.14 |
| 2002 | $10.53 | $40.77 (Jan. - Sept.) $41.07 (Oct. - Dec.) | $10.53 |
| 2003 | $11.85 | $41.87 (Jan. - Sept.) $42.13 (Oct. - Dec.) | $11.85 |
| 2004 | $13.42 | $44.36 (Jan. - Sept.) $44.59 (Oct. - Dec.) | $13.67 |

Jt. Stipl. ¶¶ 3–5.

### III. *Reclamation's performance under the Contracts*

#### 1. *1988–1992*

In 1988 Reclamation notified Stockton **\*472** East and Central that water was available and that the initial delivery date for purposes of the Contracts was January 1, 1989. *Stockton III,* 583 F.3d at 1351; *Stockton I,* 75 Fed.Cl. at 343. From 1989 through 1992, Stockton East and Central did not request water from the New Melones Reservoir, as construction of the NMCS had not been completed. *See* *Stockton III,* 583 F.3d at 1351; *see also* Tr. 95 (Kauffman) (stating NMCS was not completed until 1993). Reclamation did not deliver any water to Stockton East or Central during the 1988–1992 time period. *Stockton III,* 583 F.3d at 1351; *Stockton I,* 75 Fed.Cl. at 343.

#### 2. *1993*

In the spring of 1993, following the enactment of the CVPIA, [11] Stockton East and Central requested a meeting with representatives of Reclamation and the United States Fish and Wildlife Service ("FWS") to discuss how the CVPIA would affect the Contracts. Tr. 792 (Zolezzi). Jeanne M. Zolezzi, Stockton East's General Counsel in 1993, testified that the districts requested the meeting because FWS had made an initial prescription in March 1993 that over 200,000 acre-feet of water from the New Melones Reservoir would be allocated for environmental uses. *See* *id.* During a June 1993 meeting, representatives of Reclamation and FWS confirmed that 250,000 acre-feet of New Melones water had been reallocated from CVP contractors to fish. Tr. 792–94 (Zolezzi); *see also* Tr. 1636 (Roberts). Reclamation and FWS also told the districts that they had made a "back of an envelope" determination that this same amount would be needed for fish in every year. Tr. 792 (Zolezzi). According to Ms. Zolezzi, Reclamation and FWS made clear that "this prescription would continue and in only the wettest years might [the districts] see some water." Tr. 795 (Zolezzi); *see also* Tr. 1636 (Roberts) ("[A]t that meeting, Frank Dimmick, I believe his name is and Wayne White, Dimmick was there representing the Bureau, Mr. White was there representing Fish and Wildlife Service, spoke about what had

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.    8

transpired over the past year and basically said there was not going to be any water to honor the contracts it had to make.... [T]here was the passage of the CVPIA[.]"). Despite defendant's skepticism that Ms. Zolezzi's recent testimony was so specific, the court found Ms. Zolezzi credible on this point, as consistent with other testimony during the 1996 liability trial. [12]

[11]    In 1992 Congress enacted the CVPIA, which directed Reclamation to dedicate annually 800,000 acre-feet of water from the CVP for fish, wildlife, and habitat restoration needs. *See Stockton III,* 583 F.3d at 1351. For a more detailed discussion of the CVPIA, *see id.* at 1354–56; *Stockton I,* 75 Fed.Cl. at 338–42.

[12]    Although Ms. Zolezzi's testimony at the liability trial referenced the 1993 meeting with Reclamation and FWS, her testimony did not focus on that meeting. *See* Liab. Trial Tr. 1024–26 (Zolezzi).

The testimony during the liability trial almost six years earlier of both Messrs. Steffani and Roberts was substantially the same on this issue. *Compare* Liab. Trial Tr. 425–26 (Steffani) ("And we were told at that meeting [which he placed in spring 1993] that we would be getting no water. And the people in attendance were about ready to throw the people out from the Bureau [of] Fish and Wildlife, especially after we asked Fish and Wildlife representatives if they could document the need for the 200,000 acre-feet for fish flow: How did you determine that you need that much water for fish in the Stanislaus River this year? We want to know all of the science behind this. And I believe it was Jim McKevitt from the Fish and Wildlife Service said, 'Well, we really don't have anything much except what we've written on the back of an envelope.' "), *with* Liab. Trial Tr. 170 (Roberts) ("[T]he Reclamation official whose name was Frank Dimmick ... indicated that no water was going to be delivered to either district that year. That all the water was going to go to meet the requirements of the CVPIA.").

In 1993 Stockton East submitted an oral request, on behalf of both Central and Stockton East, for a total of 20,000 acre-feet of water, with 10,000 allocated between each district. *Stockton III,* 583 F.3d at 1352; *Stockton I,* 75 Fed.Cl. at 343. Reclamation did not deliver any water under the Contracts **\*473** in 1993. *Stockton III,* 583 F.3d at 1352; *Stockton I,* 75 Fed.Cl. at 343.

### 3. *1994–1995*

For 1994 Stockton East requested 75,000 acre-feet of water, and Central requested 25,000 acre-feet of water. *Stockton III,* 583 F.3d at 1352; *Stockton I,* 75 Fed.Cl. at 343–44. In February of that year, Reclamation announced an initial forecast of "zero water supply" for the districts based on "conditions caused by California's fourth driest year in 85 years." *Stockton III,* 583 F.3d at 1352; *Stockton I,* 75 Fed.Cl. at 343–44. Reclamation later informed the districts that no water could be delivered due to insufficient rain and snowfall conditions, explicitly invoking the shortage provision of Article 9(a) of the Contracts. *Stockton III,* 583 F.3d at 1352, 1361–62; *Stockton I,* 75 Fed.Cl. at 343–44. Neither Stockton East nor Central received any water under the Contracts in 1994. *Stockton III,* 583 F.3d at 1353; *Stockton I,* 75 Fed.Cl. at 344.

For 1995 Stockton East initially requested 65,000 acre-feet of water, and Central initially requested 50,000 acre-feet. *Stockton III,* 583 F.3d at 1353, 1364; *Stockton I,* 75 Fed.Cl. at 344. Reclamation informed the districts that a total of 37,000 acre-feet would be made available to the districts, citing the general drought and water level conditions in the New Melones Reservoir. *Stockton III,* 583 F.3d at 1353; *Stockton I,* 75 Fed.Cl. at 344. Following a dispute regarding the districts' water conservation plans, their water requests for the year were reduced. *Stockton III,* 583 F.3d at 1353, 1364; *Stockton I,* 75 Fed.Cl. at 344. Reclamation was unable to meet the districts' requests for water in 1995. *Stockton III,* 583 F.3d at 1353.

The Federal Circuit affirmed this court's ruling that Reclamation's failure to provide the minimum volumes of water in 1994 and 1995 was excused because the shortage provision of Article 9(a) applied to those years. *Stockton III,* 583 F.3d at 1363–64.

### 4. *1996*

For 1996 Stockton East initially requested 32,400 acre-feet, and Central requested 40,000 acre-feet. *Stockton III,* 583 F.3d at 1353; *Stockton I,* 75 Fed.Cl. at 345. Reclamation announced an allocation of 49,000 acre-feet to the districts in 1996 and made available all of the water that Stockton East initially requested for that year. *Stockton I,* 75 Fed.Cl. at 345. Stockton East later significantly reduced its requested amount to 4,000 acre-feet, citing "the wet '95–'96 winter, and because of the unusually large amount of storage in New Hogan Reservoir, [Stockton East's] primary source." *Id.*; *see also Stockton III,* 583 F.3d at 1353. In 1996 Reclamation

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.    9

delivered 12,969 acre-feet to Stockton East, PX 434, [13] and 17,508 acre-feet to Central, *Stockton III*, 583 F.3d at 1353; *Stockton I*, 75 Fed.Cl. at 345.

[13]  The columns labeled "USBR M & I" and "USBR AGR" in PX 434 show the amount of water that Reclamation delivered to Stockton East under the Contract for the years 1995 to 2011. Tr. 126 (Kauffman). The summary chart depicted in PX 434 is based upon monthly reports that Stockton East and Central submitted to Reclamation depicting the daily flows to both districts. *See* Tr. 121 (Kauffman). The amounts listed in PX 434 differ slightly from the delivery quantities recited in this court's liability opinion and the Federal Circuit's opinion. *Compare* PX 434, *with Stockton III*, 583 F.3d at 1352–53, *and Stockton I*, 75 Fed.Cl. at 347. Because the discrepancies are immaterial and both parties cite PX 434 as evidence of Reclamation's deliveries to Stockton East, the court accepts PX 434 as an accurate representation of the quantities of water that Reclamation delivered to Stockton East.

### 5. *1997–1998*

In 1997 the parties completed and agreed to an Interim Plan of Operations (the "IPO"), which allocated water to the districts based upon annual storage and inflow at the New Melones Reservoir. *Stockton III*, 583 F.3d at 1353. Stockton East and Central agreed to the IPO as a short-term modification to the Contracts for 1997 and 1998. *Id.* In each of those years, the districts were allocated a combined total of 50,000 acre-feet, and Reclamation's water deliveries complied with the terms of the IPO. *Id.*

### 6. *1999–2004*

Although the IPO was intended to be operational for 1997 and 1998, Reclamation continued **\*474** to use the IPO formulas to allocate water to the districts from 1999 through 2004. *Id.* The following chart summarizes the volumes of water (in acre-feet) that the districts requested and that Reclamation allocated to the districts from 1999 through 2004:

| Year | Amount Requested by Stockton East | Amount Requested by Central | Amount Allocated (Total) |
|---|---|---|---|
| 1999 | 23,000 | None | 60,000 |
| 2000 | 24,000 | None | 90,000 |
| 2001 | 24,000 | None | 34,000 |
| 2002 | 3,500 | 12,000 | 15,500 |
| 2003 | 10,000 (combined with Central) | 10,000 (combined with Stockton East) | 10,000 |
| 2004 | None | 25,000 | 15,000 (Central only) |

*Id.*; *Stockton I*, 75 Fed.Cl. at 347. [14] Reclamation delivered the followings volumes of water to Stockton East and Central under the 1983 Contracts from 1999 through 2004:

[14]  At closing argument defendant pointed to PX 551 as evidence that Stockton East and Central failed to take large volumes of water that Reclamation allocated to the districts in 1999 and 2000. Closing Arg. Tr. 153 (Harrington) (discussing PX 551); *see also* Tr. 91, 156 (Harrington). Figure 2–13 in PX 551, Stockton East's Water Supply Plan dated December 2008, presents

a bar graph showing unused CVP allocations in two of the breach years—1999 and 2000. *See* PX 551, at 2–13. Although PX 551 shows an "East Side CVP Allocation" of 90,000 acre-feet in 1999, this court previously found that Reclamation allocated a total of 60,000 acre-feet to Central and Stockton East in 1999. *Compare* PX 551, at 2–13, *with Stockton I*, 75 Fed.Cl. at 347; *see also Stockton III*, 583 F.3d at 1353. Defendant has not adequately accounted for this material discrepancy and has not shown that the unused "East Side CVP Allocation" illustrated in PX 551 was allocated only to Central and Stockton East. *See, e.g.*, Tr. 2124–25 (Kauffman).

The court therefore finds that its 2007 liability opinion accurately reflects the amount of water allocated by Reclamation to Central and Stockton East.

| Year | Amount Delivered to Stockton East | | | Amount Delivered to Central (Ag Water) |
|------|-----------|---------|--------|--------|
|      | M&I Water | Ag Water | Total |        |
| 1999 | 23,078 | 5,112 | 28,190 | 33,786 |
| 2000 | 2,939  | 4,254 | 7,193  | 27,759 |
| 2001 | 4,671  | 2,359 | 7,030  | 25,750 |
| 2002 | 2,066  | 1,422 | 3,488  | 10,503 |
| 2003 | 1,260  | 1,135 | 2,395  | 9,845  |
| 2004 | 0      | 1,486 | 1,486  | 13,605 |

See PX 434; Jt. Stipl. ¶ 6. [15]

[15]  As discussed *supra* note 13, the columns labeled "USBR M & I" and "USBR AGR" in PX 434 show the volumes of water that Reclamation delivered to Stockton East. *See* PX 434. Central and Reclamation stipulated to the amounts delivered to Central for the years 2001 through 2004. Jt. Stipl. ¶ 6. For deliveries to Central in 1999 and 2000, the amounts listed in the chart above reflect the findings of fact from this court's liability opinion and the Federal Circuit's opinion. *See Stockton III,* 583 F.3d at 1353; *Stockton I,* 75 Fed.Cl. at 347.

Defendant relies on Central's interrogatory responses for the amounts delivered to Central in 1999 and 2000. *See* DX 1099 at 4. Central's interrogatory response for 2000, however, lists a delivery amount of 28,153 acre-feet—approximately 400 acre-feet greater than the amount listed in the prior opinions. Mr. Roberts also testified at the damages trial that 28,153 acre-feet was the correct amount of water that Central purchased from Reclamation in 2000. *See* Tr. 1661–62, 1665–66 (Roberts). Raising a hearsay objection and citing Fed.R.Evid. 403, counsel for Central objected to defense counsel's questioning Mr. Roberts about Central's interrogatory responses. Tr. 1662–63 (Marzulla). Although this objection is due to be overruled and Mr. Roberts agreed with defendant's figures, this discrepancy is immaterial in view of the court's ultimate findings on Central's expectancy damages.

**\*475** Reclamation's failure to provide the minimum quantities of water listed in the Build-Up Schedule violated

the requirements of Article 3 of the Contracts. *Stockton III,* 583 F.3d at 1364; *Stockton II,* 76 Fed.Cl. at 489. In contrast to the years 1994 and 1995, Reclamation's non-performance during the 1999–2004 time period was not excused by the shortage provision of Article 9(a), and Reclamation therefore was liable for breaching the Contracts in the years 1999 through 2004. *Stockton III,* 583 F.3d at 1364, 1369.

## IV. *Central's purchases of water from SSJID in 2002, 2003, and 2004*

Central entered into three separate water sale contracts with South San Joaquin Irrigation District ("SSJID") from 2002 to 2004. *See* DX 996 (2002 contract); DX 978 (2003 contract); DX 996 (2004 contract). [16] Pursuant to those contracts, Central purchased from SSJID 20,000 acre-feet of water in 2002, 15,000 acre-feet of water in 2003, and 10,000 acre-feet of water in 2004. Tr. 1648–51, 1668, 1676 (Roberts); *see also Stockton III,* 583 F.3d at 1370. Paragraph 3 of each contract states that Central will pay SSJID $15 per acre-foot for the water made available to Central. [17] DX 966, at 2; DX 978, at 2; DX 996, at 2.

[16]  The record includes a copy of the 2004 contract—DX 996—that was not signed by both parties to the contract. *See* DX 996, at 4. Mr. Roberts reported that Central could not locate a copy of the contract with both signatures. Tr. 1682 (Roberts).

[17]  Although Central's contracts with SSJID list a purchase price of $15 per acre-foot, the parties dispute whether Central actually paid this amount to SSJID. The court

JA12

addresses this issue in the "Discussion" section of the opinion.

## PROCEDURAL HISTORY

A trial court takes note when its appeals court encourages an expedited resolution on remand. *See Stockton E. Water Dist.,* 638 F.3d at 785. The facts are that this case sat for over eleven years in federal district court; after transfer to the United States Court of Federal Claims and the revival of proceedings in April 2004, it was bifurcated at the parties' request and thereafter litigated on liability until May 2007; and it was on appeal and rehearing until April 2011 when it was returned for trial on damages. *See generally Stockton IV,* 101 Fed.Cl. at 354–55 (setting forth chronological history to date).

This case began in 1993, when plaintiffs filed a complaint in the United States District Court for the Eastern District of California and enumerated five untitled claims for relief. "As characterized by the district court, these claims were (1) impairment of 'vested rights under ... water contracts [ ] in violation of the Fifth Amendment due process clause'; (2) violation of the National Environmental Policy Act for failure to prepare an environmental impact statement; (3) violation of the CVPIA, § 3410; (4) arbitrary and capricious action by the Government; and (5) violation of the Fifth Amendment's takings clause." *Stockton IV,* 101 Fed.Cl. at 354 (dismissing takings claim) (quoting *Westlands Water Dist. v. United States,* No. CV–F–93–5327 (E.D.Cal. Feb. 11, 1994) (consolidated cases)).

On January 29, 2004, the district court transferred the takings claim to the Court of Federal Claims. *Id.* at 355 (citing *Stockton E. Water Dist. v. United States,* Nos. CV–F–93–5896, CV–F–96–5738 (E.D.Cal. Jan. 30, 2004) (order transferring cases) (consolidated cases)). This court received the transferred action on April 1, 2004, and plaintiffs filed their Amended Complaint on April 20, 2004, seeking relief for a taking and breach of **\*476** contract. *See* Amended Compl. filed Apr. 20, 2004. Defendant filed a motion to dismiss on June 21, 2004, *inter alia,* seeking to dismiss the breach of contract claim, which this court denied by order entered on September 3, 2004. *See Stockton E. Water Dist. v. United States,* 62 Fed.Cl. 379 (2004).

After the parties filed a Joint Status Report on October 22, 2004, requesting the court to bifurcate the case, with liability to be tried first, and damages thereafter only if liability was found, an order entered on October 27, 2004,

bifurcated the liability and damages phases of the case. In 2005 the parties filed cross-motions for summary judgment regarding the breach of contract claim. The court granted in part defendant's summary judgment motion, denied plaintiffs' partial summary judgment motion, and identified the issues for trial. *See Stockton E. Water Dist. v. United States,* 70 Fed.Cl. 515, 536 (2006).

Trial on liability was held October 23, 2006, through November 2, 2006. The court awarded judgment for defendant on the breach of contract claims for 1993 through 2004 and dismissed the takings claim. *See Stockton I,* 75 Fed.Cl. at 376 (determining liability and entering judgment on the merits). The court subsequently granted in part and denied in part plaintiffs' motion to alter or amend the judgment, *Stockton II,* 76 Fed.Cl. at 482, and denied plaintiffs' motion for reconsideration, *Stockton E. Water Dist. v. United States,* 76 Fed.Cl. 497, 512 (2007). Plaintiffs appealed to the United States Court of Appeals for the Federal Circuit, which affirmed this court's judgment of non-liability as to plaintiffs' breach of contract claims for 1994 and 1995, reversed this court's judgment of non-liability as to plaintiffs' breach of contract claims for 1999 through 2004, and vacated this court's dismissal of plaintiffs' takings claim. *Stockton III,* 583 F.3d 1344, *reh'g en banc granted in part, aff'd,* 638 F.3d 781. Plaintiffs did not appeal this court's judgment of non-liability as to the breaches alleged in 1993, 1996, 1997, and 1998. *See id.* at 583 F.3dat 1354. This court was tasked with deciding plaintiffs' takings claim and determining damages for the breaches that occurred from 1999 through 2004. *Id.* at 1369.

Since April 11, 2011, this matter has been before the court on remand from the Federal Circuit. On July 19, 2011, defendant moved to dismiss the complaint for lack of jurisdiction, invoking the United States Supreme Court's decision in *United States v. Tohono O'Odham Nation,* –––– U.S. ––––, 131 S.Ct. 1723, 179 L.Ed.2d 723 (2011). *Tohono* construed 28 U.S.C. § 1500 (2006), to foreclose the Court of Federal Claims from hearing any claim based on the same operative facts underlying a claim encompassed in a pending, prior-filed action in federal district court. *See Tohono,* 131 S.Ct. at 1731. Following briefing by the parties, plaintiffs filed a Motion for Voluntary Dismissal of Their Claim for Taking Without Just Compensation. Defendant responded to plaintiffs' motion, arguing that jurisdiction—a threshold issue—must be resolved before the court could entertain plaintiffs' motion for voluntary dismissal. On October 31, 2011, this court dismissed plaintiffs' takings claim, but denied

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

defendant's motion to dismiss as to plaintiffs' breach of contract claim. *Stockton IV,* 101 Fed.Cl. at 362.

On June 18, 2012, defendant moved for summary judgment with respect to the claims of both Stockton East and Central. Plaintiffs filed cross-motions for summary judgment, which the court denied because adjudication of the cross-motions did not comport with the deadline for filing dispositive motions set by an earlier order. Order entered July 10, 2012, ¶ 2. However, all arguments made in support of plaintiffs' cross-motions were considered as complementing their respective briefs in opposition to summary judgment. *Id.* On July 19, 2012, the court granted defendant's motion with respect to Central only insofar as Central was seeking a "market value" measure of damages representing the measure of damages for a takings claim. Order entered July 1, 2012[260]. The court otherwise denied defendant's motions with respect to both plaintiffs without prejudice to any party raising issues that are appropriate for ruling on motions *in limine. Id.*; Order entered July 1, 2012[259].

**\*477** After the close of discovery, the parties submitted a total of twenty-three motions *in limine* and other pre-trial motions. On August 24, 2012, the court held a pretrial conference and entered a lengthy epistle discussing each of the motions.[18] *See* Order entered Aug. 24, 2012 (the "pretrial order"). The pretrial order noted that the "appeals court affirmed this court's findings on the scope of the breach, i.e., failure to deliver a minimum quantity of water for each of the breach years." *Id.,* ¶ 12. Accordingly, the court ruled that the "non-breaching buyer's recovery is limited by that minimum quantity and whatever damages can be attributed to the failure to deliver up to that quantity." *Id.,* ¶ 5.

[18] In its pretrial order, the court deferred ruling on some arguments raised in the motions *in limine.* For example, in response to defendant's motion *in limine* arguing that Stockton East's stranded costs claim was tantamount to a claim for interest, the court noted that trial will "provide the appropriate context for ascertaining whether the incurred financing costs are overhead or interest." Order entered Aug. 24, 2012, at 18–19. The court explained, however, that "Stockton East is aware that it can recover overhead in the form of fixed costs and will present its claim as incurred costs that it could not recover due to the breach." *Id.* The rulings in the pretrial order therefore do not supersede this court's rulings at trial or in this opinion.

The damages trial was held in Sacramento, CA, from September 10, 2012, through September 19, 2012.[19] At

the conclusion of Stockton East's case-in-chief, defendant moved for judgment on partial findings, pursuant to RCFC 52(c), with respect to Stockton East's damages claims for "groundwater recharge" and "stranded costs." Tr. 1332–33 (Harrington). The court declined to grant the motion, noting that it was in the interest of justice to have a full record, especially in light of the lengthy history of this litigation. Tr. 1377–79. Post-trial briefing was completed on December 21, 2012, and closing arguments were held on January 4, 2013.

[19] Although the court has considered the testimony of every witness, discussion of each is not necessary to render a comprehensive decision. Stockton East proceeded first at trial and presented the following witnesses: (1) Kevin M. Kauffman, General Manager of Stockton East; (2) Mark J. Madison, former Director of Utilities of the City of Stockton; (3) Jeanne M. Zolezzi, former General Counsel of Stockton East; (4) Francis S. Ferraro, Vice-President of California Water Service Company; (5) Timothy O'Laughlin, counsel for Oakdale Irrigation District; (6) Clay J. Landry, Managing Director of WestWater Research and an expert in western water markets; (7) Elpedio V. Jamosmos, Finance Director of Stockton East; (8) Elaine Vastis Conti, Manager of Raftelis Financial Consultants and an expert in identifying and allocating the costs of water conveyance facilities; and (9) Everett P. Harry, Partner of Harry Torchiana LLP and an expert in the analysis and computation of breach of contract damages.

Central then presented the following witnesses: (1) Timothy J. Durbin, an expert in the hydrology of the Eastern San Joaquin Groundwater Basin; (2) Reid W. Roberts, General Counsel of Central; (3) Angela K. Slaughter, Chief of the Water Contracts and Policy Branch of Reclamation's Sacramento, CA office; (4) Grant O. Thompson, Chairman of Central's Board of Directors; and (5) Dr. Rodney T. Smith, President of Stratecon, Inc., and an expert in California water markets.

Defendant presented the following witnesses: (1) Steven P. Emrick, General Counsel for South San Joaquin Irrigation District; (2) Mr. Kauffman; (3) Ali Shahroody, a water research engineer for Stetson Engineers, Inc. and an expert in water resources and agricultural engineering; and (4) Dr. David L. Sunding, Professor in the College of Natural Resources at the University of California, Berkeley and an expert in natural resource economics, economic damages, agricultural economics, and the economics of water resources.

WestLaw Next © 2013 Thomson Reuters. No claim to original U.S. Government Works.

## DISCUSSION

### I. *Cost of cover*

#### 1. *Standard for awarding damages for cost of cover*

**[1]** **[2]** Central seeks $194,560.00 in damages to recover its mitigation costs associated with its water sale contracts with SSJID. *See* Pl. Central's Br. filed Nov. 9, 2012, at 34. "A non-breaching party may generally recover its mitigation costs incurred in a reasonable effort to avoid loss caused by a breach, even if its efforts prove unsuccessful." *Old Stone Corp. v. United States,* 450 F.3d 1360, 1368 (Fed.Cir.2006) (citing Restatement (Second) of Contracts §§ 350 cmt. h, 347 cmt. c (1981)). Mitigation damages "are intended to reimburse a non-breaching party to a contract for the expenses it incurred in attempting to rectify the injury the breach caused it." *Citizens Fed. Bank v. United States,* 474 F.3d 1314, 1320 (Fed.Cir.2007).

**[3]** **[4]** **[5]** ***478** A non-breaching party has a duty to mitigate its damages. *Ind. Mich. Power Co. v. United States,* 422 F.3d 1369, 1375 (Fed.Cir.2005); *Robinson v. United States,* 305 F.3d 1330, 1336 (Fed.Cir.2002) (" 'As a general rule, a party cannot recover damages for loss that he could have avoided by *reasonable efforts*.' " (quoting Restatement (Second) of Contracts § 350, cmt. b (1981))). The obligation to mitigate damages arises " '[o]nce a party has reason to know that performance by the other party will not be forthcoming[.]' " *Ind. Mich. Power Co.,* 422 F.3d at 1375 (quoting Restatement (Second) of Contracts § 350, cmt. b). A non-breaching party therefore may recover its costs of mitigation even if it incurred those costs prior to the breach. *Id.* When mitigating damages from a breach, the non-breaching party must "make only 'those efforts that are fair and reasonable under the circumstances.' " *First Heights Bank, FSB v. United States,* 422 F.3d 1311, 1316 (2005) (quoting *Home Sav. of Am., FSB v. United States,* 399 F.3d 1341, 1353 (Fed.Cir.2005)).

**[6]** **[7]** **[8]** One way for a buyer to reasonably mitigate a seller's breach is to "cover" or, in other words, to enter into a transaction to obtain substitute goods from another seller. *See Hughes Commc'n's Galaxy, Inc. v. United States,* 271 F.3d 1060, 1066 (Fed.Cir.2001) (explaining that the Uniform Commercial Code "provides useful guidance in applying general contract principles"); *LaSalle Talman Bank, F.S.B. v. United States,* 317 F.3d 1363, 1373 (Fed.Cir.2003) ("[R]eduction of loss through a substitute transaction is generally a direct mitigation of damages."); *see also* Restatement (Second) of Contracts § 350 cmt. e (discussing meaning of "substitute"). To constitute reasonable cover, the substitute goods need not be identical to those involved in the contract, as long as they are " 'commercially usable as reasonable substitutes under the circumstances.' " *Hughes Commc'n's,* 271 F.3d at 1066 (quoting U.C.C. § 2–712 cmt. 2); *see also* Restatement (Second) of Contracts § 350 cmt. e ("Whether an available alternative transaction is a suitable substitute depends on all the circumstances, including the similarity of the performance and the times and places that they would be rendered."). When a buyer covers, the buyer's remedy for the seller's breach equals the difference between the cover price and the contract price plus any other losses, such as consequential or incidental damages. *See Hughes Commc'n's,* 271 F.3d at 1066 (citing U.C.C. § 2–712; *Farnsworth on Contracts,* § 12.11 (2d ed. 1988)).

### 2. *Analysis*

#### 1) *The amount of Central's payments to SSJID*

Central argues, and defendant does not contest, that its purchases of water from SSJID constitute mitigation. Accordingly, Central is entitled to the difference between the price that it paid to SSJID and the price that it would have paid for that amount of water had it been provided by Reclamation. It is law of the case that Central purchased 20,000 acre-feet of water in 2002, 15,000 acre-feet of water in 2003, and 10,000 acre-feet of water in 2004 from SSJID. *See Stockton III,* 583 F.3d at 1370. The parties disagree, however, as to the amount paid to SSJID for that water.

**[9]** Central takes the position that it paid SSJID $15 per acre-foot for the water purchased in 2002, 2003, and 2004. *See* Pl. Central's Br. filed Nov. 9, 2012, at 20. Central points first to the language of the water purchase agreements, each of which states the purchase price as $15 per acre-foot in Paragraph 3. *See id.*; DX 966, at 2; DX 978, at 2; DX 996, at 2. [20] Next, Central cites the testimony of its General Counsel Mr. Roberts, who stated repeatedly that the purchase price was $15 per acre-foot. *See* Pl. Central's Br. filed Nov. 9, 2012, at 20–22; Tr. 1647–51 (Roberts). Central also cites the testimony of its board's chairman, Mr. Thompson, and SSJID's General Counsel Steven P. Emrick, both of whom testified to ***479** the $15 per acre-foot price. *See* Pl. Central's Br. filed Nov. 9, 2012, at 20–22; Tr. 1972–73 (Thompson);

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.    14

Tr. 2080–84 (Emrick). Central therefore asserts that it paid SSJID $675,000.00 (45,000 total acre-feet at $15 per acre-foot) for water purchased in 2002, 2003, and 2004.[21] *See* Pl. Central's Br. filed Nov. 9, 2012, at 21.

[20]    Central cites PX 610, PX 616, and PX 660 for its references to the water purchase agreements, *see* Pl. Central's Br. filed Nov. 9, 2012, at 20 n.58, but those exhibits were not entered into evidence. Defendant introduced the water purchase agreements as exhibits DX 966, DX 978, and DX 996, which were received in evidence. *See* Tr. 1668–69 (admitting DX 966); Tr. 1676–77 (admitting DX 978); Tr. 1682–84 (admitting DX 996).

[21]    Central argues in passing and without citation that its cost of cover is $825,000.00, representing the $675,000.00 that it asserts was paid to SSJID, plus the $150,000.00 purchase price, at $15 per acre-foot, for 10,000 acre-feet of water that Central was entitled to, but did not, purchase from SSJID in 2002. *See* Pl. Central's Br. filed Nov. 9, 2012, at 33. The purchase price for cover water that Central could have purchased but did not cannot be included in Central's cost of cover; Central properly is understood to have forgone costs of cover in favor of other measures of damages with respect to that water. *See* U.C.C. § 2–712(3) ( "Failure of the buyer to effect cover within this Section does not bar him from any other remedy."), cmt. 3 ("The buyer is always free to choose between cover and damages for non-delivery[.]").

Defendant takes the position that Central paid SSJID $300,000.00 for water based upon Central's audited financial statements for the years 2002, 2003, and 2004. *See* Def.'s Br. filed Nov. 29, 2012[361], at 11–12. Central's audited

financial statements reflect payments of $75,000.00 to SSJID in each of 2002 and 2003, and of $150,000.00 in 2004. *See* DX 1169, at CJ03678; DX 1068, at CSJW_005276; *see also* Tr. 1913–14 (Roberts). Defendant further points to Mr. Roberts's agreement with the proposition that the audited financial statements "should provide an honest and accurate description of [Central's] finances [,]" Tr. 1848 (Roberts), and Central's stipulation that it "[did not] have reason to believe that they are incorrect[,]" Tr. 1873 (Marzulla). Although an earlier version of Central's 2004 audited financial statement reflected a payment to SSJID of $375,000.00 in 2004, *see* DX 1170, at CSJW_005259, Mr. Roberts testified that $150,000.00 was likely the correct amount, based upon the purchase of 10,000 acre-feet at $15 per acre-foot in 2004, *see* Tr. 1917–18 (Roberts). Moreover, defendant asserts, Messrs. Thompson and Emrick testified only as to the contract price for water in the water purchase agreements, not the amounts paid. *See* Tr. 1972–73 (Thompson); Tr. 2080–84 (Emrick).

Defendant also offered the testimony of Dr. David L. Sunding, who was qualified as an expert to offer opinions on natural resource economics, economic damages, agricultural economics, and the economics of water resources. *See* Tr. 2315. Based upon total payments of $300,000.00 as reflected in the audited financial statements and a total volume of water purchased of 45,000 acre-feet, Dr. Sunding opined that the price Central paid to SSJID per acre-foot was $6.67. Tr. 2354–56 (Sunding).

Defendant calculates that Central would have paid Reclamation a total of $525,050.00 for the amount of water purchased from SSJID:

| Year | Volume Purchased from SSJID (acre-feet) | Reclamation Price | Total Cost |
| --- | --- | --- | --- |
| 2002 | 20,000 | $10.53 | $210,600.00 |
| 2003 | 15,000 | $11.85 | $177,750.00 |
| 2004 | 10,000 | $13.67 | $136,700.00 |
| | | Total: | $525,050.00 |

*See* Def.'s Br. filed Nov. 29, 2012[361], at 12 (citing DX 1186; Jt. Stipl. ¶ 5). Accordingly, defendant argues, Central paid $300,000.00 to SSJID—less than the $525,050.00 that it would have paid to Reclamation for the same amount of water—and Central therefore is not entitled to any mitigation damages. *Id.* Even if one uses the $375,000.00 figure

for payments to SSJID reflected in the earlier version of Central's 2004 audited financial statement, defendant points out, the total payments to SSJID in Central's audited financial statements would be $525,000.00. *Id.* at 25. That amount is still less than the amount that Central would have paid to Reclamation, **\*480** and Central thus has no costs of cover. *Id.*

JA16

Central rests on its introduction, in its rebuttal case, of an offer of proof [22] consisting of copies of five checks made out to SSJID by Central, arguing that they show that Central paid SSJID a total of $675,000.00. *See* Pl. Central's Br. filed Nov. 9, 2012, at 20–21. The first check, dated May 17, 2002, is in the amount of $225,000.00 and is accompanied by a letter from Mr. Roberts to Mr. Emrick referencing the water purchase agreement between Central and SSJID and stating that the payment is for 15,000 acre-feet of water at $15 per acre-foot. PX 663. The second check, dated July 17, 2002, is in the amount of $75,000.00 and also is accompanied by a letter from Mr. Roberts to Mr. Emrick, stating that the payment is for 5,000 acre-feet of water. PX 664. The third check, dated May 14, 2003, is in the amount of $225,000.00. PX 665. It is not accompanied by a letter, but the memorandum line states that it is for "Water Sale." *Id.* The fourth check, dated April 23, 2004, is in the amount of $75,000.00 and states in the memorandum line that it is for "Payment for water sale for 2004." PX 666. It is also accompanied by a letter from Mr. Roberts to Steve Stroud, SSJID's General Manager, stating that the payment is for the purchase of water for the 2004 water year. *Id.* The fifth and final check, dated June 3, 2004, is in the amount of $75,000.00 and states in the memorandum line that it is for "Purchase of 5,000 ac. ft. water[.]" PX 667. The check is accompanied by a letter from Mr. Roberts to Mr. Stroud, stating that the payment is for 5,000 acre-feet of water. *Id.*

22  The court allowed Central to put its evidence in the record pursuant to Fed.R.Evid. 103(a)(2). *See* Tr. 2492. Defendant reasonably objected that the rebuttal improperly constituted proof of Central's case-in-chief. As discussed more fully in the body of this opinion, the court now admits the checks on the ground that Central offered the best evidence, *i.e.,* copies of checks, after defendant put the payment in doubt through the use of Central's own conflicting financial statements.

In determining Central's cost of cover damages, the court first must find the amount that Central paid to cover defendant's breach. It already has been established that Central purchased a total of 45,000 acre-feet of water from SSJID, *seeStockton III,* 583 F.3d at 1370, and the water purchase agreements between Central and SSJID recite that the purchase price was $15 per acre-foot, *see* DX 966, at 2; DX 978, at 2; DX 996, at 2. These facts, however, do not resolve the question of what Central actually paid to SSJID to cover Reclamation's failure to deliver water.

Central's General Counsel Mr. Roberts testified at several points that Central paid SSJID $15 per acre-foot of water in each year that it purchased water from SSJID:

A. Well, [SSJID was] willing to sell us water for $15 an acre-foot, and they did[.]

....

Q. 2002, yes, and how much water were you able to purchase?

A. We had an understanding or an agreement for up to 30,000, and we purchased 20,000.

Q. And what was the purchase price?

A. $15 an acre-foot.

Q. How about in 2003? Did Central purchase water from South San Joaquin?

A. Yes, we did. We purchased 15,000 acre-feet from them[.]

Q. And at what price?

A. $15 an acre-foot.

....

Q. Was Central able to purchase water in 2004?

A. Yes, we were.

Q. How much?

A. 10,000 acre-feet.

Q. Also from South San Joaquin?

A. Yes.

Q. Also $15 an acre-foot?

A. Yes.

Tr. 1647, 1649–51 (Roberts). Contrary to defendant's assertion, Mr. Thompson, Chairman of Central's Board of Directors, did not testify only to the contract price. Like Mr. Roberts, he testified, albeit briefly, to the price Central paid for water from SSJID. *See* Tr. 1973 ("Q. But South San Joaquin told you it would sell you water for $15 per acre **\*481** foot, is that correct? A. Yeah. Yeah. Q. And that's what

you paid. A. Right."). Central therefore presented evidence showing that it paid $675,000.00 to SSJID for 45,000 acre-feet of cover water at $15 per acre-foot.

Defendant ventured to impeach Mr. Roberts's testimony on cross-examination, introducing the audited financial statements showing payments by Central to SSJID of $75,000.00 in 2002, $75,000.00 in 2003, and either $375,000.00 or $150,000.00 in 2004. *See* Tr. 1913–14, 1917–18 (Roberts). After Mr. Roberts testified that $150,000.00 was likely the correct amount for 2004 because Central had purchased 10,000 acre-feet at $15 per acre-foot from SSJID in 2004, *see* Tr. 1917–18 (Roberts), defendant's expert, Dr. Sunding, opined that Central had paid $6.67 per acre-foot for water from SSJID, based upon total expenditures of $300,000.00 reflected in the audited financial statements. *See* Tr. 2354–56 (Sunding). Defendant's evidence, accordingly, shows that Central paid $300,000.00 to SSJID for 45,000 acre-feet of cover water at $6.67 per acre-foot.

Defendant makes much of the representation of Central's counsel regarding the audited financial statements, asserting that "Central stipulated to the accuracy of all line items in all of its audited financial statements [.]" Def.'s Br. filed Dec. 21, 2012[366], at 16. That statement somewhat mischaracterizes what was a qualified stipulation, however, to wit, Central "[did not] have reason to believe that they are incorrect." Tr. 1873 (Marzulla). Mr. Roberts's testimony was similarly qualified. *See* Tr. 1848 ("Q. Central's audited financial statement, it should provide an honest and accurate description of the district's finances. A. Yes, it should."). While the record contains evidence that the audited financial statements are incorrect, the court acknowledges defendant's frustration in reasonably relying on Central's qualified stipulation.

Dr. Sunding testified, based upon calculations performed using the figures from the audited financial statements, that Central paid $6.67 per acre-foot for water from SSJID. Dr. Sunding's figure seems rather low, given the contract price of $15 per acre-foot and the testimony that Central paid that amount, and particularly in light of the cross-examination testimony of SSJID's General Counsel Mr. Emrick that SSJID's board considered even the $15 per acre-foot price to be less than market value. *See* Tr. 2084 (Emrick).

Moreover, Dr. Sunding performed his calculation in the aggregate, dividing the total price paid as postulated by

defendant, $300,000.00, by the total volume purchased, 45,000 acre-feet. Calculating the price paid on a per-year basis yields figures that are even further afield. The audited financial statement for 2002, the year in which Central purchased the most water from SSJID, reflects that Central paid $75,000.00 to SSJID. *See* DX 1169, at CJ03678. When that figure is divided by the 20,000 acre-feet purchased in 2002, the purchase price for 2002 appears to be $3.75 per acre-foot. A similar calculation for 2003, dividing $75,000.00, *see id.*, by the 15,000 acre-feet purchased in that year, yields a per-acre-foot price of $5.00. Only 2004, for which the audited financial statement reflects payment of $150,000.00 for 10,000 acre-feet of water, *see* DX 1068, at CSJW_005276, is in line with both the contracts and the testimony of Messrs. Roberts and Thompson. Notably, if credence is given to the earlier version of the 2004 audited financial statement, which reflected a payment to SSJID of $375,000.00, *see* DX 1170, at CSJW_005259, the calculated per-acre-foot price for that year is $37.50. These disparate deviations from the contract price, which was the same for each year and which SSJID's board believed to be below-market, suggest that the audited financial statements are less than accurate.

The parties spent much time at trial debating the extent to which the court may rely upon the checks introduced in Central's rebuttal case. *See* Tr. 2431–43, 2486–92. Although the court initially expressed the view that Central could use the checks only to resolve the apparent discrepancy between the two audited financial statements for 2004, *see* Tr. 2442–43, it noted that Dr. Sunding had put in issue the price that Central paid to SSJID for water, and that the offer of proof went to the price paid, *see* Tr. 2514–15, 2519.

 **\*482**  The parties have not cited any relevant precedent as to the proper scope of rebuttal evidence, and it is a subject upon which it does not appear the Federal Circuit has ruled. As the United States Court of Appeals for the First Circuit and other federal appellate courts have stated,

> "Rebuttal is a term of art, denoting evidence introduced by a plaintiff to meet new facts brought out in [the] opponent's case in chief." *Morgan v. Commercial Union Assurance Cos.*, 606 F.2d 554, 555 (5th Cir.1979) (emphasis omitted). "The determination of what constitutes proper rebuttal evidence [lies] within the sound discretion of the [district court]." *Hickok v. G.D. Searle & Co.*, 496 F.2d 444, 447 (10th Cir.1974).

*Lubanski v. Coleco Indus., Inc.*, 929 F.2d 42, 47 (1st Cir.1991). The court rules that the checks introduced by

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Central properly constitute rebuttal evidence to Dr. Sunding's opinion testimony that Central paid SSJID $6.67 per acre-foot of water. Defendant characterizes Dr. Sunding's opinion as merely a calculation and argues that rebuttal evidence can go only to whether that calculation should have been based upon a particular version of the 2004 audited financial statement. *See* Tr. 2432–33 (Harrington). Defendant is correct in the sense that Central was entitled to present rebuttal evidence that fairly meets the assumptions underlying Dr. Sunding's calculations. As Dr. Sunding testified, his opinion was based upon the amounts shown in the audited financial statements. *See* Tr. 2355 (Sunding). The checks introduced in Central's rebuttal case raise questions about those audited financial statements, and consequently Dr. Sunding's calculations. They therefore properly are admitted as rebuttal evidence.

The checks reflect that Central made payments to SSJID in 2002 of $300,000.00, in installments of $225,000.00 and $75,000.00; in 2003 of $225,000.00; and in 2004 of $150,000.00, in two equal installments of $75,000.00. *See* PX 663, 664, 665, 666, 667. Those amounts are consistent with the price paid, per the testimony of Messrs. Roberts and Thompson; the contract price of $15 per acre-foot; and the volumes purchased. Twenty-thousand acre-feet purchased in 2002 at $15 per acre-foot yields a total of $300,000.00; 15,000 acre-feet purchased in 2003 at $15 per acre-foot yields a total of $225,000.00; and 10,000 acre-feet purchased in 2004 at $15 per acre-foot yields a total of $150,000.00. The checks, each of which either bore or was accompanied by indicia that it was for the purchase of water, thus suggest that the audited financial statements are unreliable. [23]

[23]    Interestingly, if all of the audited financial statements are totaled, *i.e.,* $75,000.00 (2002) plus $75,000.00 (2003) plus $375,000.00 (2004) plus $150,000.00 (2004), the resulting sum is $675,000.00. Central's counsel adverted to this at trial, positing that the 2004 audited financial statements may not have been alternative to one another. *See* Tr. 2487 (Marzulla) ("Yes, and I guess what I'm posing, Your Honor, is perhaps they're both correct. That is that they are additive and not alternative. It's not the case that they are inconsistent, but rather that the numbers all add up.").

Defendant further objected to the introduction of the checks on the ground of prejudice, as they were not on Central's exhibit list. *See* Tr. 2507–10 (Harrington). While it certainly may have behooved Central to present the checks as part of its case-in-chief, likely eliminating what became a donnybrook

at trial, as well as obviating the need for this lengthy discussion, the court finds that any prejudice is minimal. Defendant argued at trial that it lost the opportunity to explore whether there was an alternative explanation for the amounts shown on the checks. *See* Tr. 2509 (Harrington). Ironically, the audited financial statements that defendant seeks to credit undercut defendant's position on that point. Not one of those statements contains a line item for payment to SSJID for anything other than water fees. *See* DX 1068, 1169, 1170. Furthermore, the checks and/or the letters accompanying them indicate that they are payment for water purchases. *See* PX 663, 664, 665, 666, 667. Defendant also argued that it would have questioned SSJID's General Counsel Mr. Emrick about the discrepancy between the checks and the audited financial statements. *See* Tr. 2509–10 (Harrington). Mr. Emrick, however, gave testimony regarding **\*483** a chart that he prepared, entitled "Actual Use 2001–2011," showing Central's purchases of 20,000 acre-feet of water in 2002, 15,000 in 2003, and 10,000 in 2004. *See* Tr. 2056–59, 2065 (Emrick); DX 1156. That chart also shows a purchase price in each year of $15. *See* DX 1156. Mr. Emrick's testimony therefore corroborates the checks, as well as the testimony of Messrs. Roberts and Thompson regarding water purchases. To the extent that defendant was prejudiced by the introduction of the duplicate checks, such prejudice is overcome by the resolution of the discrepancies in the record by accepting the checks as best evidence of payment, *see* Fed.R.Evid. 1003, and warrants their introduction into evidence and the court's reliance thereon.

The court finds that Central paid SSJID $15 per acre-foot for 45,000 acre-feet of water during the period of 2002–2004, totaling $675,000.00, based upon the language of the contracts, the testimony of Messrs. Roberts, Thompson, and Emrick, and the checks introduced in Central's rebuttal case. For the reasons discussed above, the court finds that the audited financial statements, and consequently the testimony of Dr. Sunding as to the price paid per acre-foot, are not determinative.

### 2) *Payment of wheeling charges*

[10]    The parties do not address the role of wheeling charges in their discussion of Central's cost of cover damages. When Central receives New Melones water, it is "wheeled" by Stockton East to Central's conveyance system. *See* Tr. 634–35 (Kauffman); Tr. 1692 (Roberts). Central is to pay for that service pursuant to contracts between the two water districts.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.    18

*See* Tr. 1692 (Roberts); Tr. 635–36, 2115 (Kauffman); DX 1185, at 48, 50. The water that Central purchased from SSJID also came from the New Melones Reservoir and had to be wheeled by Stockton East to Central's conveyance system. *See* DX 1185, at 47–48. It is therefore fair to infer, and the court finds, that any wheeling charges that Central avoided by Reclamation's breach are equal to any wheeling charges incurred in connection with Central's purchase of water from SSJID. Wheeling charges do not enter into the calculation of Central's cost of cover damages.

### 3) *Cost of cover*

**[11]** The parties agree as to the price Central would have paid to Reclamation for the amounts of water purchased from SSJID. *Compare* Pl.'s Br. filed Nov. 9, 2012, at 33, *with* Def.'s Br. filed Nov. 29, 2012[361], at 12 (citing DX 1186; Jt. Stipl. ¶ 5). The total amount that Central would have paid to Reclamation is $525,050.00. Subtracting that figure from the $675,000.00 that Central paid to SSJID, the court finds that Central is entitled to cost of cover damages in the amount of $149,950.00.

## II. *Expectancy damages*

### 1. *Standard for awarding expectancy damages*

**[12]** **[13]** **[14]** Central seeks expectancy damages in an amount between $10,654,417.00 and $15,326,360.00. Pl. Central's Br. filed Nov. 9, 2012, at 34. The purpose of expectancy damages is to make the non-breaching party whole by providing it with the benefits it expected to receive from the contract had the breach not occurred. *Fifth Third Bank v. United States,* 518 F.3d 1368, 1374 (Fed.Cir.2008) (citing *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1379 (Fed.Cir.2001)). The Federal Circuit has cautioned, however, that " '[a] non-breaching party is [generally] not entitled, through the award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred.' " *Kan. Gas and Electric Co. v. United States,* 685 F.3d 1361, 1366 (Fed.Cir.2012) (quoting *LaSalle Talman Bank,* 317 F.3d at 1371 (first alteration in original)); *see also Old Stone Corp.,* 450 F.3d at 1378 ("[T]he non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." (citations and internal quotation marks omitted)). Although expectancy damages can include lost profits, they are not limited to lost profits. *Fifth Third*

*Bank,* 518 F.3d at 1374 (citing *Glendale Fed. Bank,* 239 F.3d at 1379).

**[15]** **\*484** A party is entitled to expectancy damages if it can make three showings. *Id.* First, the damages must have been reasonably foreseeable at the time the parties entered into the contract. *Id.* (citing *Cal. Fed. Bank v. United States,* 395 F.3d 1263, 1267 (Fed.Cir.2005)). Second, the damages must be caused by the breach. *Id.* (citing *Cal. Fed. Bank,* 395 F.3d at 1267). Third, the measure of damages must be reasonably certain. *Id.* (citing *Cal. Fed. Bank,*395 F.3dat 1267).

**[16]** **[17]** Foreseeability, causation, and proof of damages to a reasonable certainty are all issues of fact to be determined by the trial court. *Id.* at 1375 (citing *Home Sav. of Am.,* 399 F.3d at 1347); *Bluebonnet Sav. Bank, F.S.B. v. United States,* 266 F.3d 1348, 1355–57 (Fed.Cir.2001) ( "*Bluebonnet III* ") (explaining that "[f]oreseeability is a question of fact reviewed for clear error[,]" "[c]ausation is also a question of fact reviewed under the clear error standard[,]" and reviewing a finding of reasonable certainty under the clear error standard). The burdens of proving causation, foreseeability, and proof of damages lie with the claimant. *SeeAnchor Sav. Bank, FSB v. United States,* 597 F.3d 1356, 1362 (Fed.Cir.2010) (discussing burden in context of lost profits claim); *Precision Pine & Timber, Inc. v. United States,* 596 F.3d 817, 833 (Fed.Cir.2010) ("[T]he party seeking damages has the burden of proving them with 'reasonable certainty.' "); *Yankee Atomic Electric Co. v. United States,*536 F.3d 1268, 1273 (Fed.Cir.2008) (discussing plaintiff's burden to prove causation).

### 1) *Foreseeability*

**[18]** **[19]** **[20]** **[21]** As the Federal Circuit has held, the party seeking expectancy damages "must show that the claimed damages were within the realm of reasonable foreseeability at the time the contract was entered into [.]" *Fifth Third Bank,* 518 F.3d at 1374 (citing *Cal. Fed. Bank,* 395 F.3d at 1267). Actual foresight is not required, and the "specific loss in question" need not be "within the contemplation of the parties at the time of contracting." *Anchor Sav. Bank,*597 F.3d at 1364. Reasonable foreseeability requires " 'merely that the injury actually suffered must be one of a kind that the defendant had reason to foresee and of an amount that is not beyond the bounds of reasonable prediction.' " *Id.* (quoting 11 Joseph M. Perillo,

*Corbin on Contracts* § 56.7, at 108 (rev. ed. 2005)). The breaching party will not be liable, however, " 'for a particular type of loss that was so unusual as not to be foreseeable.' " *Id.* (quoting E. Allen Farnsworth, *Farnsworth on Contracts* § 12.14, at 262 (3d ed. 2004)).

### 2) *Causation*

[22]  [23]  [24]  A plaintiff seeking expectancy damages also must establish that the breach caused the damages. *Fifth Third Bank,* 518 F.3d at 1374. In *Winstar* cases and Spent Nuclear Fuel ("SNF") cases, the Court of Federal Claims has applied two different standards in determining causation of damages: the "but-for" test and the "substantial factor" test. *See Citizens Fed. Bank,* 474 F.3d at 1318–20. In the "but-for" test, the plaintiff must establish that the damages would not have occurred "but for" the breach. *Cal. Fed. Bank,* 395 F.3d at 1267. However, the breach need not be "the sole factor or sole cause" of the damages, and therefore "[t]he existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." *Id.* at 1267–68 (affirming trial court's decision to apply "substantial factor" test) (citing *Farnsworth on Contracts* § 12.1, at 150–51). Under the "substantial factor" standard, in contrast, the plaintiff must show that the breach is a "substantial causal factor" in the damages. *See Ind. Mich. Power Co.,* 422 F.3d at 1374 (citing *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1320 (Fed.Cir.2002)).

[25]  The Federal Circuit has explained that the "selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion." *Citizens Fed. Bank,* 474 F.3d at 1318. Although the Federal Circuit has affirmed trial court decisions applying the "substantial factor" test in *Winstar* and SNF cases, the Federal Circuit has stated a preference for the "but-for" test. *See Yankee Atomic,* 536 F.3d at 1272 (explaining that the "but-for" test is the "traditional" **\*485** and "preferred" standard for determining causation). Accordingly, this court will apply the "but-for" standard of causation to Central's claim for damages.

[26]  Regardless of the causation standard applied, the Federal Circuit has held that " 'it is incumbent upon [a plaintiff seeking expectancy damages] to establish a plausible 'but-for' world.' " *S. Nuclear Operating Co. v. United States,* 637 F.3d 1297, 1304 (Fed.Cir.2011) (quoting *Yankee Atomic,* 536 F.3d at 1273); *see also Kan. Gas and Electric,* 685 F.3d

at 1371 (citing *Yankee Atomic,* 536 F.3d at 1273; *Bluebonnet Sav. Bank, FSB v. United States,* 67 Fed.Cl. 231, 238 (2005) ("*Bluebonnet VI* ")); *Energy Nw. v. United States,* 641 F.3d 1300, 1308 (Fed.Cir.2011) ("[T]he burden of proving the non-breach world ... lie[s] with [the plaintiff]."); *Yankee Atomic,* 536 F.3d at 1273 (quoting *Bluebonnet VI,* 67 Fed.Cl. at 238). In other words, the plaintiff bears the burden of demonstrating "what might have been" absent the breach. *Glendale Fed. Bank,* 239 F.3d at 1380.

Plaintiffs have been denied expectancy damages where the Court of Federal Claims "could not accurately assess [plaintiffs'] damages" because there was insufficient evidence to "perform the necessary comparison between the breach and non-breach worlds[.]" *Kan. Gas and Electric,* 685 F.3d at 1371; *Yankee Atomic,* 536 F.3d at 1273 ("Without record evidence about [plaintiffs'] condition with full Government performance, the Court of Federal Claims could not perform the necessary comparison between the breach and non-breach worlds and thus could not accurately assess the [plaintiffs'] damages." (citations omitted)). In *Kansas Gas and Electric,* for example, an SNF plaintiff could not obtain damages for a spent fuel storage study because the record showed that the plaintiff would have been required to pursue a similar study regardless of the breach, and the plaintiff did not provide record evidence comparing the costs of the studies in the breach and non-breach worlds. 685 F.3d at 1371. In *Bluebonnet Savings Bank,* a *Winstar* case, the Federal Circuit similarly rejected an expectancy damages claim based on a failed but-for model. *Bluebonnet III,* 266 F.3d at 1358; *see also Bluebonnet IV,* 67 Fed.Cl. at 238 (explaining that "the Federal Circuit recognized that plaintiffs were responsible for establishing the 'but-for' world"). The plaintiffs in *Bluebonnet Savings Bank* had contended that, in the "but-for" world, they would have obtained capital infusions through loans at a "speculative" interest rate and that they would have repaid their debt promptly. *Bluebonnet III,* 266 F.3d at 1358. However, the plaintiffs presented no evidence "that anyone would have loaned [plaintiffs] the funds [,]" and the only witness who testified as to the interest rate predicated the availability of the rate on contingencies for which no evidence was introduced. *Id.*

[27]  [28]  [29]  A proper calculation of expectancy damages accounts for avoided costs—costs that a plaintiff would have incurred in the non-breach world but has not incurred in the breach world. *See S. Nuclear Operating Co.,* 637 F.3d at 1303–04 (citations omitted); *Yankee Atomic,* 536 F.3d at 1273 (discussing plaintiff's failure to account for

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.     20

avoided costs); *Bluebonnet Sav. Bank, F.S.B. v. United States,* 339 F.3d 1341, 1345 (Fed.Cir.2003) ("*Bluebonnet V* "). The plaintiff's recovery must be reduced by the amount of avoided costs, "[i]n order to ensure that the [damages award] ... does not represent an overstatement of the loss fairly attributable to the breach." *Bluebonnet V,* 339 F.3dat 1345; *see alsoCarolina Power & Light Co. v. United States,* 573 F.3d 1271, 1277 (Fed.Cir.2009) (affirming trial court finding that plaintiff did not avoid certain costs). Although the plaintiff bears the burden of persuasion with respect to avoided costs, the plaintiff's burden to "incorporate those saved costs into its formulation of a plausible but-for world" arises only when the defendant first "move[s] forward by pointing out the costs it believes the plaintiff avoided because of the breach." *S. Nuclear Operating Co.,* 637 F.3d at 1304 (instructing on remand that, "[s]hould the government fail to timely point out specific shortcomings in the plaintiff's causation proof on the issue of saved costs and, in appropriate circumstances, produce supporting evidence, the court is entitled to treat the issue as waived").

**\*486 3) *Proof of damages to a reasonable certainty***

[30]  [31]  [32]  A party seeking expectancy damages also must prove its damages to a reasonable certainty. *Fifth Third Bank,* 518 F.3d at 1374; *Cal. Fed. Bank,* 395 F.3d at 1267. However, "where responsibility for damage is clear, it not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision[.]" *Bluebonnet III,* 266 F.3d at 1355; *see alsoSan Carlos Irrigation & Drainage Dist. v. United States,* 111 F.3d 1557, 1563 (Fed.Cir.1997) (citing *Elec. & Missile Facilities, Inc. v. United States,* 416 F.2d 1345, 1358 (Ct.Cl.1969)). When damages are not proved with mathematical precision, "the court's duty is to 'make a fair and reasonable approximation of the damages.' " *Bluebonnet III,* 266 F.3d at 1356–57 (quoting *Ace–Fed. Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed.Cir.2000)). "If 'a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery [.]' " *Fifth Third Bank,* 518 F.3d at 1374–75 (quoting *Cal. Fed. Bank,* 395 F.3d at 1267). Recovery of speculative damages, however, is precluded. *Ind. Mich. Power Co.,* 422 F.3d at 1373 (citing *San Carlos Irrigation & Drainage Dist.,* 111 F.3d at 1563).

**2. *The volume of water that Central would have taken but for Reclamation's breach***

The evidence and the parties' arguments focused largely on establishing the "but-for" world, *i.e.,* what would have happened absent Reclamation's breach. A primary component of that scenario is the amount of water that Central would have taken in the breach years if Reclamation had made full allocations available; if Central would not have taken water that was unavailable due to Reclamation's breach, it follows that it suffered no damages as a result of Reclamation's breach. Central argues that it would have taken 56,000 acre-feet of water in each breach year, based upon the language of the 1983 Contract, evidence of Central's agricultural demand for surface water, and potential sales of surface water by Central. *See* Pl. Central's Br. filed Nov. 9, 2012, at 3–4. The court addresses each argument in turn.

**1) *The 1983 Contract's "take or pay" provision***

Central argues that it would have taken 56,000 acre-feet of water in each of the breach years because Article 3 of the 1983 Contract obligated Central to pay Reclamation for at least that much water. *See id.* at 9–10. In Central's view it would be irrational for it to pay for 56,000 acre-feet of water and not to request that amount. *Seeid.* at 11. Central points to the Federal Circuit's finding that Article 3 required Central to pay for at least 56,000 acre-feet of water per year in the breach years, *see id.* at 10 (citing *Stockton III,* 583 F.3d at 1351), and the testimony of Mr. Roberts that it was his understanding that Central would have had to pay for at least 56,000 acre-feet of water per year if Reclamation had not breached, *seeid.* (citing Tr. 1643–44 (Roberts)).

Defendant responds that Central ignores the testimony of its General Counsel Mr. Roberts that, in practice, Central paid Reclamation only for water that was actually delivered, not for the minimum amounts under the 1983 Contract. *See* Def.'s Br. filed Nov. 29, 2012[361], at 16–17 (citing Tr. 1821–23, 1827, 1867 (Roberts)). Consequently, the only circumstance under which Central would have paid for 56,000 acre-feet of water was if Central actually requested that much water from Reclamation. *See id.* at 18.

Central rejoins that defendant has not provided any reason why Reclamation would not have insisted on enforcement of the "take or pay" provision if Reclamation had fully performed under the 1983 Contract. *See* Pl. Central's Br. filed Dec. 10, 2012, at 8. With respect to the practice of paying only for water delivered, Central posits that Reclamation could not have required compliance with the "take or pay"

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.    21

provision in years during which Reclamation failed to make full allocations. *See id.* at 9.

In *Stockton III* the Federal Circuit did recite in its factual summary that Article 3 in the 1983 Contract is a 'take or pay' provision. *S ee* 583 F.3d at 1351 ("Article 3 also establishes for each year of the contract a *minimum* amount of water that Reclamation **\*487** is obligated to make available, and for which the Districts must pay[.]"). No finding appears in that opinion, however, that the provision was enforced. Mr. Roberts's testimony establishes that the provision, in fact, was not enforced. As he stated, Central paid Reclamation only for water that was delivered during the breach years. *See* Tr. 1821 (Roberts) ("Q. The practice in the 1999 to 2004 period was for Central to only pay for water actually delivered from the Bureau of Reclamation, correct? A. That's correct[.]").

Mr. Roberts further testified that the provision also was not enforced in non-breach years:

> Q. Mr. Roberts, before 1999, was the practice then also to pay only for the amount delivered by the Bureau of Reclamation?
>
> A. My understanding was that once the interim plan of operations was put in, that that was how it was working, yes.
>
>     ....
>
> Q. And what about the year 1996? You did get water from the Bureau of Reclamation in 1996, correct?
>
> A. Yes, we did.
>
> Q. You only paid for the volume of water in 1996 that the Bureau of Reclamation actually delivered.
>
> A. I believe that's the case.
>
>     ....
>
> Q. In 1996, in fact, you only paid for the volume of water that was actually delivered to Central.
>
> A. I think that's true.
>
>     ....
>
> Q. And so your understanding is that the amount paid for water in 2005 was based on the actual delivery of water to Central.

> A. Yes.
>
> Q. So both before and after the period 1999 to 2004, the practice between Central and the Bureau of Reclamation was to pay for the volume of water actually delivered under the New Melones contract.
>
> A. That was the practice that we engaged in. Yes.

Tr. 1822–23, 1827 (Roberts). This evidence undercuts Central's argument that Reclamation's failure to enforce the "take or pay" provision was the product of Reclamation's own breach of the 1983 Contract. Moreover, Central points to no evidence in the record supporting that assertion. As discussed in Part II.1.2) *supra*, it is Central's burden, as plaintiff, to establish the "but-for" world. For that reason, Central's argument that defendant has not shown why Reclamation would not have insisted on compliance with Article 3 if it were making full deliveries also is unavailing.

**[33]** The court finds that, while Article 3 is a "take or pay" provision, the evidence establishes that the provision would not have been enforced absent Reclamation's breach. The practice of the parties, in both breach and non-breach years, was for Central to pay only for water actually delivered by Reclamation. Central's position is that it was obligated to pay for 56,000 acre-feet of water per year and, therefore, that it would have requested that amount each year. The evidence shows that Central would not have been so obligated. [24] Accordingly, the terms of the 1983 Contract do not support a finding that Central would have taken 56,000 acre-feet of water in each of the years 1999–2004 if Reclamation had not breached.

24    Central's position that the "take or pay" provision alone supports a finding that it would have taken 56,000 acre-feet per year also ignores the fact that, for New Melones water requested from Reclamation, Central incurs wheeling charges beyond the delivery payment to Reclamation. *See* DX 1185, at 50; *see also* Tr. 2130–31 (Kauffman) (stating that amount of wheeling charges depended in part upon amount of water). That additional charge provides at least one reason for Central not to request the 1983 Contract minimum amount even if the "take or pay" provision were enforced.

**2)** *Central's agricultural demand for surface water*

Next, Central argues that the evidence of demand for surface water shows that Central would have taken 5 6, 000 acre-feet of water in each of the breach years. *See* Pl. Central's Br. filed Nov. 9, 2012, at 11–18. The thrust of Central's position is that demand existed by its farmers sufficient to take that amount **\*488** of New Melones water each year, but that Reclamation's failure to make the contract minimums available in the breach years dampened that demand.

Central begins its survey of the evidence with that regarding demand for supplemental surface water around the time of the 1983 Contract. Central points, first, to a July 8, 1983 memorandum in which the Commissioner of Reclamation estimated Central's New Melones water requirements at 72,000 acre-feet per year. *See id.* at 12 (citing PX 601); Closing Arg. Tr. 113–14 (Marzulla) (citing PX 601). Central's General Counsel Mr. Roberts testified that studies prior to and contemporaneous with the 1983 Contract had indicated that Central required 80,000 acre-feet of supplemental surface water per year. *See* Pl. Central's Br. filed Nov. 9, 2012, at 12 (citing Tr. 1588 (Roberts)). He further stated that, at the time the 1983 Contract was executed, no one from Reclamation or Central expressed the view that Central would be unable to take up to 80,000 acre-feet of New Melones water per year. *See id.* at 13 (citing Tr. 1603 (Roberts)). Finally, Central draws the court's attention to the March 8, 1983 order of the State of California Water Resources Control Board amending Reclamation's reservoir permit, in which it was noted that Reclamation had entered into a contract with Central for 80,000 acre-feet of water per year. *See id.* at 13–14 (citing JX 7); Closing Arg. Tr. 116–17 (Marzulla) (citing JX 7).

Central proceeds to turn to evidence surrounding Central's construction of its water conveyance system, first to a report commissioned by Central and performed by the engineering firm CH2M Hill Consulting Engineers ("CH2M") regarding the design and cost of the water conveyance system Central would need to build to use New Melones water. *See* Pl. Central's Br. filed Nov. 9, 2012, at 14–15 (citing DX 812; Tr. 1611–12, 1622–23 (Roberts)); Closing Arg. Tr. 120–21 (Marzulla) (citing DX 812). The report, dated November 21, 1990, states that farmers had signed letters of intent to take approximately 65,000 acre-feet per year, which CH2M reduced by 20% for revenue projection purposes, to 50,000 acre-feet per year. *See* DX 812, at CJ02318; Pl. Central's Br. filed Nov. 9, 2012, at 14–15 (citing DX 812). According to the testimony of Timothy J. Durbin, who was qualified as an expert on the hydrology of the Eastern San Joaquin Groundwater Basin, *see* Tr. 1501–02, a conveyance loss of

30% occurs as water travels from the New Melones Reservoir to the agricultural land in Central's district, *see* Tr. 1535–37 (Durbin). Central therefore argues that, in order to meet the demand for 50,000 acre-feet of water, over 70,000 acre-feet would need to be released to account for the conveyance loss. *See* Pl. Central's Br. filed Nov. 9, 2012, at 14–15.

Central next cites the testimony of Mr. Roberts regarding a farmer survey that he conducted after delivery of the CH2M report. *See id.* at 15 (citing Tr. 1625 (Roberts)); Closing Arg. Tr. 121–22 (Marzulla). Mr. Roberts stated that he conducted a survey of farmers in the district in March 1991. Tr. 1624–25 (Roberts). After he tabulated responses showing demand for 55,000 acre-feet of water per year, he reviewed the responses with Central's board and turned them over to CH2M. *Id.* Thereafter, Central's board approved the issuance of $7.4 million in bonds to finance construction of the water conveyance system. Tr. 1623, 1626 (Roberts). Mr. Roberts stated that farmer response to the then-underway project was positive. Tr. 1632–33 (Roberts). Central places blame for flagging enthusiasm on Reclamation, arguing that there is "no evidence that Central's farmers would not have taken the full allocation of surface water ... but for the Government's announcement that there would be little or no New Melones water under the contract. Nothing else had changed, and no reason appears why the farmers would have been any less enthusiastic about surface water in the but-for world where the Government actually performed as promised." Pl. Central's Br. filed Nov. 9, 2012, at 17. Central further cites the testimony of Mr. Roberts that, absent Reclamation's breach, Central would have requested a full allocation of 80,000 acre-feet of water in each of the breach years. *See id.* at 17–18 (citing Tr. 1642–43 (Roberts)).

**\*489** Finally, Central lists its requests for 25,000 acre-feet in 1994, 50,000 acre-feet in 1995, and 40,000 acre-feet in 1996. *See* Closing Arg. Tr. 123–24 (Marzulla).

Defendant's primary argument with respect to Central's agricultural demand is that the evidence does not show an unmet demand, as Central fulfilled all farmer requests for surface water during the breach years, and there was water available to Central in the breach years that it did not take. *See* Def.'s Br. filed Nov. 29, 2012[361], at 7–11. Defendant asserts that Central chose to forgo Reclamation water that was delivered to Stockton East and for which Central had a priority right, as well as Reclamation water that was not requested by either Central or Stockton East. *See id.* Furthermore, defendant states, Central did not seek

to purchase additional water from SSJID that was available during the breach years and made no attempts to purchase water from other sources. *See id.*

Defendant disputes that the evidence cited by Central can support a finding that Central would have had any demand for surface water beyond that met by Central in the breach years. Thus, Central's reliance on the estimates of surface water demand made around the time of the 1983 Contracts is misplaced. *See id.* at 18. As defendant points out, those estimates were made at least fifteen years prior to the beginning of the breach period. *Seeid.* They therefore have little bearing on actual farmer demand for surface water during the breach period. *Seeid.*

Turning to the evidence contemporaneous with Central's financing of its water conveyance system, defendant notes that Central did not have copies of the letters of intent referenced in the CH2M report, and no evidence has been introduced regarding their content. *Seeid.* (citing Tr. 1792–93 (Roberts); DX 1184, at 202–03). Defendant points to Mr. Roberts's trial and deposition testimony that the letters of intent were neither commitments to take water nor binding contracts. *Seeid.* (citing Tr. 1792–94 (Roberts); DX 1184, at 202). With respect to the survey that Mr. Roberts allegedly conducted, defendant remarks that Central did not present any written evidence of that survey, thereby making it impossible to know the questions asked and the responses thereto. *See id.* at 18 n.6.

Defendant discounts Central's argument that farmer enthusiasm for surface water fell after the 1993 meeting with Reclamation and FWS in which it was made clear that Reclamation would not make full deliveries under the 1983 Contracts. *See id.* at 19. Defendant notes that Central did not present any testimony from farmers within the district, to the end that Central's enthusiasm argument is speculative. *See id.* at 19 n.7. While defendant concedes that it is "conceivable" that some farmers did not invest in surface water delivery systems because of Reclamation's failure to deliver water in the mid–1990s, the Federal Circuit found no breach in those years. *See id.* at 19 (citing *Stockton III,* 583 F.3d at 1363–64). Defendant argues that Central therefore cannot predicate its damages claim, whether directly or indirectly, on non-delivery in those years. *Seeid.* (citing *Stockton III,* 583 F.3d at 1363-64).

 [34]  As discussed above, the court finds that Central had no priority right to New Melones water, and defendant's

argument that Central's failure to take advantage of that priority right evinces lack of demand for surface water accordingly fails. Moreover, defendant's argument that Central could not have had more demand for surface water than that satisfied by Reclamation and SSJID during the breach years also is unavailing. In determining damages, the court is to look to the "but-for" world, not the breach world. While the breach world may provide a point of reference, to find it identical to the "but-for" world is to beg the question the court must answer, *viz.,* what would have occurred absent the breach?

 [35]  Correspondingly, Central's invocation of demand for the non-breach years 1994 and 1995 reflects, in a sense, the breach world, *i.e.,* the world in which Reclamation did not make full allocations available, because 1994 and 1995 were drought years. The Federal Circuit upheld the court's findings that absolved Reclamation of liability in those years. *SeeStockton III,* 583 F.3d at 1363–64. However, for 1996 Central made a **\*490** request for 40,000 acre-feet against Reclamation's allocation of 49,000 acre-feet for both Stockton East and Central. *SeeStockton I,* 75 Fed.Cl. at 345. Although Stockton East initially requested 32,400 acre-feet, it later reduced its request to 4,000 acre-feet. *Seeid.*; *see alsoStockton III,* 583 F.3d at 1353. Thus, the two districts requested 44,000 acre-feet total against Reclamation's allocation of 49,000 acre-feet, and the full 40,000 acre-feet that Central requested was available to it. In that year, however, Central took only 17,508 acre-feet of New Melones water. *SeeStockton III,* 583 F.3d at 1353; *Stockton I,* 75 Fed.Cl. at 345. Thus, for the one year that would be indicative of the non-breach world, Central took less water than it demanded or that Reclamation allowed to it. That illustrative example therefore provides no support for the notion that Central had farmer demand of 40,000 acre-feet of New Melones water in a non-breach world.

In Central's view agricultural demand for a full allotment of New Melones water would have been present during the breach years but for Reclamation's failure to make those full allotments available. That is a credible theory, but the evidence presented by Central does not permit the court to endorse it.

With respect to the 1983 documents regarding Central's surface water demand, those documents are temporally too far removed from the breach years to provide a plausible indication as to Central's agricultural demand for surface water from 1999 to 2004. Furthermore, they are planning

documents whose apparent purpose was to estimate Central's yearly agricultural demand for surface water. While they provide evidence of what Reclamation, Central, and the State of California Water Resources Control Board believed, in 1983, about what Central's surface water needs would be in the future, they are not probative of what farmer demand for surface water would have been absent Reclamation's breach in the years 1999 to 2004.

A similar problem arises with Central's reliance upon the C112M report. Those efforts were undertaken to support Central's decision to move forward with construction of its water conveyance system, and they tend to establish that Central believed there was sufficient farmer demand for surface water to approve construction of Central's surface water conveyance system. They are not, however, probative evidence of farmer demand for surface water. Central did not introduce the letters of intent referenced in the C112M report into evidence, and the court therefore is left only with their characterization by Mr. Roberts as the non-binding expressed intentions of Central's farmers. See Tr. 1792–94 (Roberts).

As Mr. Thompson testified, a farmer must install equipment to be able to use surface water. See Tr. 1949 (Thompson). Installing that equipment requires an investment of time and money on the farmer's part; Mr. Thompson stated that it may take up to "a few months" to install the equipment and that the necessary equipment may cost anywhere from $6,000.00 to $30,000.00. See id. at 1949-50 (Thompson). Mr. Thompson also testified regarding applications to Central's capital improvement program, which showed equipment costs ranging from $8,200.00 to $136,396.59, and averaging roughly $35,000.00. See Tr. 1961–82 (Thompson); DX 1172, at 4960, 4963, 4965, 4968, 4971, 4973, 4976, 4979, 4984, 4987, 4989, 4993, 4995, 4997, 4999, 5003, 5005. As described by Mr. Thompson, the capital improvement program permitted a farmer to take a $10.00–per–acre–foot credit on imposed surface water fees up to a maximum of $150.00 per acre improved to help defray the costs of installing surface water equipment. See Tr. 1952–53 (Thompson). In the absence of the letters of intent referenced in the C112M report, it is impossible to determine whether and to what extent those letters addressed the costs associated with the use of surface water, and therefore the nature of farmer enthusiasm apparently expressed in the letters of intent. [25]

[25]    Furthermore, given Mr. Thompson's testimony that the capital improvement program did not begin until 1999,

see Tr. 1860 (Thompson), it appears unlikely that the letters of intent would have taken into account any assistance with the costs of installing surface water equipment.

Similarly to the 1983 documents, the C112M report provides evidentiary support *491 for a finding that Central believed there would be sufficient agricultural demand for a full allotment of New Melones water from Reclamation. It provides little support, however, that such demand would have materialized in response to full deliveries of the contractual minimums by Reclamation, particularly in the absence of the letters of intent the C112M report remarked upon. The C112M report therefore is entitled to little weight as an indicium of the extent to which farmers would have availed themselves of surface water—the demand for surface water—procured from Reclamation had it been allocated.

Mr. Roberts's testimony regarding the survey that he conducted in March 1991 merits less weight than the C112M report. Whereas the C112M report was introduced into evidence, see DX 812, Central presented no documentary evidence of either Mr. Roberts's survey or the responses thereto. Mr. Roberts stated that the responses indicated a "commit[ment] to take a quantity of water [,]" Tr. 1625 (Roberts), but without the responses themselves, the court cannot gauge the nature of that "commitment." For example, it is impossible to determine the survey's treatment of the costs associated with making use of surface water. Again, this testimony at most suggests that Central determined that farmer demand for surface water was sufficient to justify construction of Central's surface water conveyance system. It does not provide credible evidence that such demand would have translated into actual utilization of surface water by those farmers in the absence of Reclamation's breach in any given breach year, let alone for 1994–1998, which were prior non-breach years. Any finding that utilization would have existed at any given level for any year would be wholly speculative.

Given Central's position that its farmers were enthusiastic about using surface water until it became clear that the surface water Central planned to receive from Reclamation was not forthcoming, the absence of testimony from any farmers regarding their surface water plans is conspicuous. Central highlights what it characterized at closing argument as "the uncontradicted testimony of Mr. Roberts and of Mr. Thompson that the farmers were uniformly enthusiastic about accepting this surface water," Closing Arg. Tr. 123 (Marzulla), but that testimony provides no direct evidence of

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

farmer enthusiasm whether generally or quantitatively, and it is a thin reed upon which to rest a finding regarding Central's surface water demand.

Central did indicate at the outset of its case that it would be presenting testimony from five farmers regarding their decisions to use surface water. *See* Tr. 37 (Marzulla). Defendant promptly objected to Central's calling these witnesses on the ground that their names did not appear on Central's witness list. *See* Tr. 244–45 (Harrington). The witnesses were listed as "may call" witnesses by defendant and were subpoenaed for that reason, but Central did not incorporate defendant's witness list into its own. *See* Tr. 245–46 (Harrington). Defendant argued that it would be prejudiced by their testimony, as defendant had canceled their scheduled depositions during discovery based upon the representation by Central's counsel that the witnesses would not be called at trial. *See* Tr. 245 (Harrington). Central responded that it had not intended to call the witnesses, but that its plans changed when defendant served the witnesses with subpoenas. *See* Tr. 247–48 (Marzulla). The court sustained defendant's objection, but left open the possibility that Central might be permitted to call the farmers as rebuttal witnesses. Tr. 249–51. Ultimately, neither party called the farmers to testify.

Central suggests in its post-trial reply brief, without citation to rule or precedent, that, because defendant prevented Central from calling the farmers as witnesses and then did not call them itself, the court "may properly infer that the farmers' testimony would have supported Central's claim that its farmers were enthusiastic about surface water and would have embraced it if Reclamation's water deliveries had been more stable in accordance with the contract." Pl. Central's Br. filed Dec. 10, 2012, at 11. No such adverse inference is warranted. Defendant's opposition to the testimony properly was grounded in prejudice. With respect to defendant's decision not to call the farmers as **\*492** witnesses, it is Central's burden to establish the "but-for" world. *See* Part II.1.2) *supra*. It is not incumbent upon defendant to prove a different version of that world; defendant may show the implausibility of Central's proffered scenario. As the colloquy surrounding defendant's objection to the farmers' testimony demonstrates, that is precisely why defendant included the farmers on its witness list. *See* Tr. 245 (Harrington) ( "[T]he only reason we put them on was if there was a discrete issue that we wanted to rebut, and they are simply may call witnesses on our list."). Defendant was prepared to call the farmers only to raise doubts about Central's evidence, and its decision not to call them gives rise only to the inference

that it was unnecessary to elicit their testimony to do so. No inference arises that, if defendant had called the farmers, they would have testified that they "were enthusiastic about surface water and would have embraced it if Reclamation's water deliveries had been more stable in accordance with the contract." *See* Pl. Central's Br. filed Dec. 10, 2012, at 11.

Central's argument that the evidence shows it had farmers ready and willing to take 56,000 acre-feet of water per year until Reclamation failed to make available the contractual minimums verges on *res ipsa loquitur*. In Central's telling, Reclamation would not have undertaken the New Melones project, in part, if Central's farmers had not demonstrated their desire for surface water. Central would not have constructed its water conveyance system if that desire for surface water had not been genuine and reliable. Whether Reclamation and Central believed that Central's farmers would be able to use 56,000 acre-feet of New Melones water each year and whether that ability would have materialized, however, are two separate inquiries. Central has provided little evidence to answer the latter question.

Central argues that the evidence establishes that farmer enthusiasm for surface water was present prior to Reclamation's breach and that, because there is "no evidence that Central's farmers would not have taken the full allocation of surface water ... but for the Government's announcement that there would be little or no New Melones water under the contract[,] ... no reason appears why the farmers would have been any less enthusiastic about surface water in the but-for world where the Government actually performed as promised." Pl. Central's Br. filed Nov. 9, 2012, at 17. This line of argument ignores that it is Central's burden affirmatively to prove the "but-for" world, *see* Part II.1.2) *supra*, and attempts to place the burden on defendant to prove that the demand for New Melones water would not have developed if Reclamation had made full allocations. Central has not adduced persuasive evidence demonstrating how much New Melones water its farmers, having made the required financial investment, plausibly might have requested in the 1999–2004 non-breach world where Reclamation made full allocations under the 1983 Contract,[26] and it **\*493** accordingly has not demonstrated that its farmers plausibly would have taken 56,000 acre-feet of water in each of the breach years.

26    The capital improvement applications, about which Mr. Thompson testified, see Tr. 1961–82 (Thompson), provide some insight into surface water demand in the years following the breach period, as almost all are

dated between 2005 and 2011. *See* DX 1172, at 4960, 4963, 4965, 4968, 4971, 4973, 4976, 4979, 4984, 4987, 4993, 4997, 4999, 5003, 5005. (One application, Mr. Thompson's, bears a date of "Dec, 1994," but also indicates that it is for the "2005 Capital Improvement Program." *See* DX 1172, at 4989. Mr. Thompson's testimony did not clarify whether the application was made in 1994 or 2005, *see* Tr. 1963–64 (Thompson), but both years fall outside the breach period.) There is one capital improvement program application, dated February 2003, from the breach period. *See* DX 1172, at 4995. A comparison of applications during the breach years with those filed in the years following the breach period might have demonstrated a flagging of farmer enthusiasm for surface water during the breach years. As it happens, though, a number of the capital improvement program applications from the breach years were destroyed, which became the subject of a spoliation motion filed by defendant. *See* Order entered Aug. 24, 2012, at 19–20 (discussing motion). Defendant sought an order establishing that Central was unable to increase demand for surface water beyond that supplied by Reclamation during the breach period. *See id.* at 20. After "a robust and persuasive refutation" by Central, the court ruled that defendant would be permitted to elicit testimony about the missing documents and reserved ruling for trial. *See id.* Defendant chose not to question Central's witnesses about the missing documents, and the court accordingly finds that no prejudice has inured to defendant. In light of the lack of prejudice to defendant, and the distinct likelihood that the document destruction detracted from Central's ability to prove its case, defendant's motion for sanctions based on spoliation is denied. Central's cross-motion for sanctions is denied, as well.

### 3) *Water sales*

To the extent that Central's farmers would not have used the minimum New Melones water allocations in the "but-for" world, Central posits that it would have sold any unused water at a profit. *See* Pl. Central's Br. filed Nov. 9, 2012, at 18–19. Central points to a written policy adopted by Reclamation in 1993 to facilitate water transfers. *See id.* (citing PX 602). The policy states that water transfers "have historically been allowed." *Id.* at 19 (quoting PX 602). Central also cites the testimony of Ms. Slaughter, Chief of the Water Contracts and Policy Branch for Reclamation, Sacramento, CA, that Reclamation approves all but 2% of water transfer requests each year, as well as a list of transfers that were approved during the breach years. *Id.* (citing Tr. 1705–08 (Slaughter);

PX 622). Central concludes that there is no reason to believe that Central could not have transferred any surplus water to another district during the breach years. *Id.*

Defendant responds that the 1983 Contract prohibited Central from selling New Melones water to another district without written consent of Reclamation's contracting officer and that Central never sought or received permission to make any such sales. *See* Def.'s Br. filed Nov. 29, 2012[361], at 12 (citing PX 37; Tr. 1688, 1690–92 (Roberts); Tr. 1714–15, 173 8 (Slaughter)). Defendant further cites the deposition testimony of Mr. Roberts that, if Reclamation had not breached, Central would not have sold New Melones water to another district. *See id.* at 13 (citing DX 1184, at 150 ("Q. Would Central have sold water it received from the Bureau of Reclamation outside the district? A. No. We never had any plans to sell water outside the district. It was for—to address our overdraft as a supplemental supply for our farmers, and that was our understanding of our contract. Q. And so if the Bureau of Reclamation had delivered full contract quantities of water in the years 1999 to 2004 Central [ ] wouldn't have been selling that water outside the district? A. Not—in retrospect, not that I can see.")).

Central counters Mr. Roberts's deposition testimony with his trial testimony, in which he took the position that, if Central had been unable to use all of its New Melones water within the district, it would have sold any excess water to other districts. *See* Pl. Central's Br. filed Dec. 10, 2012, at 11 (citing Tr. 1644 (Roberts)).

**[36]** Central's evidence establishes that it would have been possible for Central to make sales of water. While the 1983 Contract places certain limits on water transfers and conditions them on Reclamation approval, *see* PX 37, at 00398; PX 602, at 3–6, Ms. Slaughter's testimony revealed that, in practice, Reclamation disapproved very few transfer requests, *see* Tr. 1705–08 (Slaughter). Ms. Slaughter did advert to potential "compliance issues" that might have affected Central's ability to transfer water, *see* Tr. 1732–34 (Slaughter), but defendant withdrew the questions regarding that subject, *see* Tr. 1738 (Snyder), and that testimony consequently does not factor into the court's finding that it was possible for Central to make transfers of water.

This predicate finding, however, does not resolve the issue of whether Central actually would have made sales of surplus water if the contractual minimums had been made available to it. On that point Central presented no credible evidence. Mr.

Roberts gave conflicting testimony at his deposition and at trial regarding Central's plans to sell surplus water. *Compare* DX 1184, at 150, *with* Tr. 1644 (Roberts). The evidence does not reflect that Central was approached regarding a transfer or that Central ever explored making a transfer, whether during the breach period or outside of it. Central characterizes the evidence as establishing that "there is quite simply no reason to believe that Central could not have transferred any surplus water to another water district." Pl. Central's **\*494** Br. filed Nov. 9, 2012, at 19. That argument both misplaces the burden and ignores Central's obligation to introduce evidence to identify potential purchasers, volumes, years—in other words, a scenario for such sales [27]—showing that it plausibly would have made such transfers, not merely that it was not contractually prohibited from doing so. Central has not adduced evidence to show that it would have sold excess New Melones water if Reclamation had made the contractual minimums available. Central therefore is not entitled to expectancy damages based upon the possibility of lost unquantified interdistrict sales.

[27]     As discussed in the following section of this opinion, Dr. Rodney T. Smith identified a spot market during the breach period and examined twenty-one transactions during the period 1998–2004. *See* Tr. 1993–2010 (Smith). This testimony did not posture Central as a player or a potential player in that market.

### 3. *Central is not entitled to expectancy damages*

 [37]   Central has not presented evidence establishing that, in the "but-for" world, *i.e.,* the world in which Reclamation makes the contractual minimums of New Melones water available during the breach years, Central would have taken more New Melones water from Reclamation than the amounts delivered in the breach world. The evidence shows that the 1983 Contract's "take or pay" provision would not have been enforced. The evidence is insufficient to find that Central's farmers would have used more Reclamation water than was delivered. The evidence also is insufficient to find that Central would have sold any water that its farmers would not have used. "[I]t is incumbent upon [a plaintiff seeking expectancy damages] to establish a plausible 'but-for' world." *S. Nuclear Operating Co.,* 637 F.3d at 1304 (quoting *Yankee Atomic,* 536 F.3d at 1273). Central has failed to carry that burden. [28] Consequently, Central is not entitled to expectancy damages.

[28]     At closing argument Central discounted the possibility that conducting after-the-fact surveys of farmers and presenting that evidence through expert testimony would

have provided support for Central's "but-for" scenario, dismissing any such studies as subject to attack by defendant as having been conducted by paid experts in contemplation of litigation. *See* Closing Arg. Tr. 124 (Marzulla). After-the-fact testimony has been credited, however, in other opinions determining the contours of a "but-for" world. *See, e.g.,Anchor Sav. Bank,* 597 F.3d at 1366–67; *Fifth Third Bank v. United States,* 71 Fed.Cl. 56, 66–68, 88 (2006), *aff'd*518 F.3d 1368 (Fed.Cir.2008). *But seeFifth Third Bank of W. Ohio v. United States,* 55 Fed.Cl. 223, 238–242 (2003) (granting summary judgment for defendant on plaintiff's after-the-fact expert report on lost profits for failing to identify specific investment opportunities lost). The court does not fault Central for the type of proof it presented, but the proof that Central advanced must show a plausible but-for world, which it failed to do.

### 4. *The putative measure of Central's expectancy damages*

Given this matter's lengthy history and in an abundance of caution, a discussion of the putative measure of Central's damages is appropriate. Had Central proven that it was damaged by Reclamation's breach, the court ruled in its pretrial order that the measure of Central's damages, whether for cover water it could not afford to purchase or for additional quantities of Reclamation water that it would have requested absent the breach, was the difference between the market price of water less the Reclamation price and operation and maintenance costs. *See* Order entered Aug. 24, 2012, at 20–21.

To that end, Central presented the testimony of Dr. Rodney T. Smith, who was qualified as an expert on the spot-market value of water with respect to Central during the breach period. *See* Tr. 1992. Dr. Smith examined eighteen one-year water transactions involving water rights originating on the San Joaquin River or its tributaries during the breach period, as well as three from 1998 because no such transactions occurred in 1999. *See* Tr. 1997–2002, 2009–10 (Smith). Using those data, Dr. Smith opined that the spot-market value of water was $60 per acre-foot in 1999, $80 in 2000, $90 in 2001, $135 in 2002, $85 in 2003, and $120 in 2004. *See* Tr. 2009–18 (Smith). Dr. Smith did not include Central's purchases of water from SSJID at $15 per acre-foot in 2002–2004 in his analysis because his opinion was that those transactions constituted mutual aid agreements and **\*495**  were not representative of the market. *See* Tr. 2029–32 (Smith).

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Defendant's expert witness Dr. Sunding agreed in general with Dr. Smith's methodology, but disagreed with the latter's decision to exclude the SSJID transactions. *See* Tr. 2322–24 (Sunding). The court finds that Dr. Smith's exclusion of the SSJID transactions was proper. As discussed above, SSJID's General Counsel Mr. Emrick testified that SSJID's board considered the $15 per acre-foot price used in those transactions to be less than market value. *See* Tr. 2084 (Emrick); *see also* Tr. 899 (Timothy O'Laughlin, attorney for Oakdale Irrigation District ("OID"), testifying that OID was unwilling to sell water at $15 per acre-foot to Central because it was less than market price). It is clear to the court that the $15 per acre-foot price did not reflect market value, and the SSJID transactions therefore appropriately were excluded from Dr. Smith's analysis.

The court also heard testimony as to the market price of water from Mr. O'Laughlin and Stockton East's expert witness, Clay J. Landry. Neither witness's testimony is entitled to as much weight as that of Dr. Smith. Mr. O'Laughlin testified only as to the price that OID wanted to charge for transfer water during the breach period, which was $100 per acre-foot. *See* Tr. 899–900 (O'Laughlin). Such a limited data set is less reflective of the broader market examined by Dr. Smith. Mr. Landry's testimony is not as probative as Dr. Smith's for a similar reason. Although Mr. Landry examined short-term contracts within the San Joaquin basin, as Dr. Smith did, he examined only transactions in which Reclamation acquired water, excluding other transactions to protect data gathered by his company that he considered proprietary. *See* Tr. 956–57 (Landry). Mr. Landry testified that he found the Reclamation transactions to be representative, but offered no further support for that statement. *See* Tr. 957 (Landry). Thus, Mr. Landry's analysis is less reliable than Dr. Smith's, and the court gives his testimony less weight than that of Dr. Smith.

Consequently, if Central had proved that it was damaged by Reclamation's breach, the proper spot-market price to use in any damages calculation would be that advanced by Dr. Smith. That price would not apply to the 10,000 acre-feet of SSJID water forgone by Central in 2002, for which the contract price of $15 per acre-foot would provide the proper measure of damages.

Determining the spot-market price would not end the inquiry, however. As discussed in Part II.1.2) *supra*, Central also bears the burden of incorporating avoided costs into its damages calculation once defendant has identified the nature of such avoided costs. *See* *S. Nuclear Operating Co.*, 637 F.3d at

1304. Defendant has done so, invoking the wheeling charges Central was contractually obligated to pay to Stockton East for the delivery of New Melones water. *See* Def.'s Br. filed Nov. 29, 2012[361], at 2–3; Def.'s Br. filed Dec. 21, 2012[366], at 14–15. Central argues that it would not have incurred any wheeling charges if Reclamation had performed fully, as Central obtained dismissal with prejudice of a lawsuit filed to collect wheeling charges. *See* Pl. Central's Br. filed Dec. 10, 2012, at 13–14. That argument is premised on what occurred in the breach world, not what would have happened in the "but-for" world, and Central has put forth no evidence showing that it would have incurred no wheeling charges if Reclamation had made full allocations during the breach years.[29] Ascertaining the amount of wheeling charges that Central would have incurred if the contractual minimums were available during the breach period therefore would be necessary to a calculation of Central's putative expectancy damages.

29    Unlike the "take or pay" provision in the 1983 Contract, no evidence reflected a practice of Central and Stockton East that Central would not pay any wheeling charges.

The evidence regarding how Central's wheeling charges were calculated is murky. The wheeling agreement is not in evidence. *See* Pl. Central's Br. filed Dec. 10, 2012, at 13; Def.'s Br. filed Dec. 21, 2012[366], at 15. Central objected to cross-examination of Mr. Roberts regarding wheeling charges because those charges were then the subject of litigation between Central and Stockton East, and Central was concerned that evidence regarding **\*496** those charges in this matter might be used in that litigation. *See* Tr. 1694 (Marzulla). The court invited Central and Stockton East to provide a sealed stipulation as to the wheeling rates for the breach period solely for the purpose of this matter, *see* Tr. 1698, but plaintiffs ultimately declined to do so. Stockton East's General Manager Mr. Kauffman testified that wheeling charges were calculated using both capital and use components, but did not go into detail as to how those calculations were made. *See* Tr. 2127–32 (Kauffman). His testimony did reflect that the wheeling charge was not consistent from year to year on a per-acre-foot basis, as the calculated per-acre-foot claimed wheeling charge was $25.51 per acre-foot in 2001 and $13 per acre-foot in 2002. *See* Tr. 2128–29 (Kauffman). Defendant directs the court's attention to the CH2M report, which states that "Stockton East Water District has agreed to wheel this water to [Central] at a charge of $10 per acre-foot." DX 812, at CJ02330; *see* Def.'s Br. filed Nov. 29, 2012[361], at 3 (citing DX 812). That document predates the construction of Central's water

conveyance system and the accrual of any wheeling charges; it therefore is of limited utility in calculating wheeling charges, particularly in light of Mr. Kauffman's testimony that, on a per-acre-foot basis, the wheeling charge varied from year to year.

A proper calculation of Central's putative expectancy damages would have to account for costs that Central avoided by Reclamation's breach. The wheeling charges that Central was contractually obligated to pay to Stockton East for New Melones water wheeled through Stockton East's facility are just such avoided costs. Once defendant identified those costs, it was incumbent upon Central to prove their amount and incorporate them into its damages model. *See* Pt. II.1.2) *supra*. Central did not do so. Any attempt to calculate Central's putative expectancy damages would be speculative.

## CONCLUSION

Based on the foregoing, Central is entitled to an award of $149,950.00 as damages for cost of cover and to no award of expectancy damages. By separate order entered this date in No. 04–541 L, the Clerk of the Court has been instructed to enter judgment for Stockton East. The Clerk of the Court shall enter judgment for plaintiff Central in the amount of $149,950.00.

**IT IS SO ORDERED.**

No costs.

---

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

JA31

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

STOCKTON EAST WATER DISTRICT v US, 2013-5078

## CERTIFICATE OF SERVICE

I, John C. Kruesi Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel press was retained by Marzulla Law, LLC, Attorneys for Plaintiff-Appellant to print this document.  I am an employee of Counsel Press.

On **July 10, 2013**, counsel for Plaintiff-Appellant has authorized me to electronically file the foregoing **Brief for Plaintiff-Appellant** with the clerk of court using the CM/ECF system, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

David A. Harrington
Department of Justice
Commercial Litigation Branch, Civil Division
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Direct: 202-616-0465
Email: david.harrington@usdoj.gov
*Attorney For Defendant-Appellee United States*

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, 6 paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

July 10, 2013                                          /s/ John C. Kruesi, Jr.
                                                       Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

_X_ The brief contains 12,294 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

_X_ The brief has been prepared in a proportionally spaced typeface using MS Word 2010 in a 14 point Times New Roman font or

____ The brief has been prepared in a monospaced typeface using _____ _____in a ___ characters per inch_____ font.

July 10, 2013          /s/ Roger J. Marzulla
                       Roger J. Marzulla
                       Counsel for Central San Joaquin
                       Water Conservation District